ELLIS, Judge.
The State of Louisiana, through the Department of Highways, under the authority conferred by Section 19.1 of Article VI of the Constitution of Louisiana, LSA, and provisions of LSA-R.S. 48:441-48:460 filed suit for the purpose of expropriating for highway purposes a parcel of ground, together with the buildings and improvements thereon, composed of Lots One (1) and Two (2) of Block No. Seventeen (17) of Honduras Addition to the City of Houma, Louisiana, the whole parcel measuring 120 feet front on Bond Street by a depth of 120 feet on Division Avenue and owned by Lonnie Tiiman Bundy, Sr., and his wife, Mrs. Lena Mae Peters Bundy, defendants in this suit. In connection with the suit the State of Louisiana, through the Department of Highways secured an order of expropriation, deposited in the registry of the Clerk of Court of Terrebonne Parish, as proper compensation for the expro *786 priation of the property of the defendants, the sum of $18,700.00 and thus effected the taking of title to the full ownership of the property.
The defendants withdrew $18,000.00 of the money deposited and filed answer alleging the value of the property expropriated to be $22,829.00.
After trial judgment was rendered fixing the compensation for the property in the sum alleged in defendant’s petition and prayed for as the value of the property, viz., $22,829.00, and the State has appealed.
The principles of law governing expropriation proceedings by which the Courts of this State must be guided in reaching a decision as to just compensation are restated in the recent case of State Through Department of Highways v. McNeely, La.App., 130 So.2d 136 and are particularly applicable to the case under consideration as to burden of proof, weight and sufficiency of testimony by witnesses testifying as to value, and we quote the following pertinent excerpts therefrom:
“ * * * However, in either case the defendant has the burden of proving his claim. LSA-R.S. 48:453. In State of Louisiana, Through Department of Highways v. Rownd, La.App., Orleans 1959, 119 So.2d 282, 288, the court observed that when the owner claims the value of the expropriated property is in excess of the estimate, he has the burden of proving his claim, and
“ ‘He must produce convincing evidence that the value is in excess of that shown in the estimate on which the Department of Highways has made the deposit.’
“Generally speaking, although the court may examine the qualifications of the several experts giving testimony and, in consequence thereof, accord greater weight to the testimony of some, yet where it appears the expert appraisers on both sides are equally well qualified and are grounded from the standpoint of sincerity and good reason, the testimony of each witness should be given consideration. Thus, it was said in Housing Authority of New Orleans v. Boudwine, 1954, 224 La. 988, 71 So.2d 541, 543:
“ ‘The greater part of the evidence adduced at the trial consisted of opinions of experts, and on them the decision herein hinges. Testimony of this nature is admissible and is often resorted to in fixing value in expropriation proceedings. Moreover, the opinion of each witness qualified and accepted as an expert should be given effect if and when it appears to be well grounded from the standpoints of sincerity and good reasoning. City of New Orleans v. Larroux, 203 La. 990, 14 So.2d 812; State v. Landry, 219 La. 456, 53 So.2d 232, and Housing Authority of New Orleans v. Brinkmann (Young), [224 La. 262, 69 So.2d 37], supra.’
* * * * # *
“The application of the above stated principles, however, does not necessarily limit the court in its evaluation of the testimony, and it is free within judicial discretion to discover error and attribute proper weight and effect thereto. The import of the rule, we think, is that the trier of fact must recognize the probative value of all the evidence adduced and should not substitute its own opinion where competent expert testimony is presented. In the Landry case the Supreme Court found deficiencies in the testimony of the experts and accorded commensurate weight thereto.
“The compensation to be awarded shall be the market value of the property taken. The market data approach, where such data may be obtained, has been preferred by the courts for determining the market value. Thus, we *787 find this pronouncement in State of Louisiana, through the Department of Highways v. Havard, 1960, 239 La. 133, 118 So.2d 131, 132:
“ ‘The best guide in determining the market value to which the owner is entitled under the law in expropriation suits is evidence of sales of similar or comparable properties in the vicinity. Housing Authority of Shreveport v. Green, 200 La. 463, 8 So.2d 295; Housing Authority of New Orleans v. Persson, 203 La. 255, 13 So.2d 853; Louisiana Highway Commission v. Israel, 205 La. 669, 17 So.2d 914; City of New Orleans v. Noto, 217 La. 657, 47 So.2d 36; City of Shreveport v. Abe Meter Corp., 219 La. 128, 52 So.2d 445; Housing Authority of New Orleans v. Brinkmann, 224 La. 262, 69 So.2d 37; and State v. Tramuta, 234 La. 741, 101 So.2d 450.’
“In many instances, however, comparable sales of properties in the vicinity which furnish the criteria for the market data approach are not available for arriving at the market value of the property taken, and in such instances other methods of valuation must be resorted to. However, regardless of the method used, the evidence will reflect differences of size, location, date of purchase, type of improvements, accessibility and other factors having some bearing upon the value of the property. It is, therefore, incumbent upon those witnesses who furnish the court with appraisals to make careful and detailed examinations of all of the comparables that can affect the market value of the subject property.” Also see State Through Department of Highways v. Tolmas, 238 La. 1, 113 So.2d 288; State Through Department of Highways v. Hub Realty Company, 239 La. 154, 118 So.2d 364.
While counsel for defendant has provided a chart in his brief showing the con-elusions of the witnesses as to the market value of the property in question, the brief of the State contains a chart giving the conclusions as to the market value of the property by all the witnesses who testified in the case. The letters “D” and “P” after each name indicate the witnesses for the defendant and plaintiff. The determination of value of the witnesses who gave such opinions are as follows:
IMPROVEMENTS LAND TOTAL
Warren Bourgeois (D) $14,500.00 $8,000.00 $22,500.00
Carl Johnson (D) 13,500.00 9,000.00 23,158.00
Charles D. Chauvin (D) 13,920.00 9,600.00 22,920.00
Nelson Henry (D) 12,100 00 11,000.00 23,160.00
E. Holland Johnson (P) 9,945.00 8,789.00 18,734.00
18,700.00
(rounded)
J. Louis Blouin (P) 11,022.50 7,500.00 18,522.50
Daniel B. Eells (P) 13,006.35 6,100.00 19,106.35
An analysis of the testimony of the seven witnesses is now in order, bearing in mind that the burden of proof is upon the defendant, that comparables are the best evidence when obtainable, although not exclusive, the qualifications of the witnesses, the thoroughness of the examination of the subject property, the sincerity and reasons which served as a basis for the valuations each has placed upon the property. We will discuss the witnesses’ testimony in the order shown on the chart.
Warren Bourgeois, Vice President of the Citizens National Bank & Trust Co., in Houma, had been employed by the bank for over twenty-one years and had appraised property for this institution for approximately twelve years for the purpose of ar-riying at a value to determine the amount to be loaned on such property. He stated that^he was familiar with land and buildings and home values in Houma, and probably made three or four appraisals per month for the bank. He was familiar with the defendant’s property and had appraised it in connection with this suit, as of April 1st, 1958. His total of $22,500.00 was made up of $8000.00 on the naked real estate, or $4000.00 approximately on each lot which measured 60 x 120 feet for a total of 120 x 120 feet, and he placed a value of *788 $14,000.00 on the residence after going through it and a value of $500.00 on a garage located in the rear of the residence. His appraisal of $8000.00 on the naked lot did include $500.00 for the trees and shrubbery on the lot.[1] This witness used no comparable ' sales but based the reasons for his appraisement on the statement that he thought the valuation was the fair market value of the property. On cross examination as to his value of $8000.00 on the land, he testified that he had placed $400.00 value on each lot and made no distinction between the fact that one lot was a corner lot and the other an inside one, however, both lots formed one piece of continuous property 120' x 120'. He had made one inspection of the property on April 1st for the purpose of appraisal and had examined the interior of the house on that occasion. He frankly stated that he was not familiar with the three methods of appraising property but knew that this property was within the city limits of Houma with sewerage in that area and that he had appraised property in that general vicinity and at one time had owned a lot which he paid $700.00 for in 1941 and at a later date paid $300.00 for the street paving and sold it in 1949 for $3500.00, and that property values had risen in the vicinity of defendant’s property quite a bit since 1949. He further stated that he knew of properties which had been bought and sold in that particular area of Houma but when asked to name some of them answered: “I can’t recall them off hand. It has been quite a while.” He could not remember the last time he appraised property in that vicinity and would not hazard a conjecture. This witness did not place any front foot value on the property but “I took it as a whole.” However, he did place a square foot value on the residence, between $8.50 and $9.00, although he excluded the square feet in the front porch. On the basis given by him per square foot, he arrived at $14,-000.00 value for the house, and allowed an evaluation of $500.00 for the trees and shrubbery which the record shows consisted of a number of large and small trees, some camellias and other shrubs. The yard was very neat and attractive.
A fair summation of this witness’s testimony will show that he was sincere, honest, with a responsible position with one of the banks and in such position he has gained a knowledge of values in the general vicinity of defendant’s property by practical experience in appraising property for the purpose of a loan by his employer. The record does not reveal that he is an expert in the full sense of the word, used no known or named comparables, other than a lot which he bought in 1941 and sold in 1949 for $3500.00, however, the dimensions of the lot are not shown in the record. Neither did he give any basis for the value of between $8.50 and $9.00 per square foot for the residence exclusive of the porch.
The defendant’s next witness was Carl Johnson, a resident of Houma and employ *789 ed by the Bank of Terrebonne and Trust Company in the note department, his major duty being appraisals, for approximately years and prior to that time employed by the Citizens National Bank for 8J4 years as assistant cashier. He is also engaged in the general insurance business associated with real estate and was an accountant. He stated he was familiar with the property belonging to the defendants and had occasion to appraise it some time in March of 1958. As a result of his appraisal he placed a value upon the property of $23,158.00 which was comprised of $9,000.00 for the lot and when questioned with regard to the value of the house stated, “I think it was 13,500 or something like that. Naturally that included the garage.” He stated the square feet in the house “was somewhere around 1350.” It was upon this appraisal that he placed a value of $23,158.00 as a fair market value for the property. The .above constituted his testimony on direct.
On cross examination he testified that he did not deal or work in real estate nor buy and sell real estate. By way of explanation 'he explained that the general insurance business brought him in association with real estate. At the request of his superiors in the bank he had made appraisals for clients of the bank and sometimes individuals would ask him to appraise property but he had not appraised property for any outside clients. His appraisals for the bank were made strictly for the purpose of loans and mortgages. He stated that he had been on the premises before the defendants owned it some six or seven years prior to the trial and he estimated the age of the house to be approximately 30 years, but at the time of his appraisal he saw evidence of major improvements and repairs since the time he had previously seen the property. As a basis for the value of the land he stated that he knew of property sales in that vicinity but not by footage, however, he could only name one specific sale on Wood Street which was approximately four and a half blocks from the defendant’s property .and the lot measured 57j4 feet by 120 feet, for a consideration of $7500.00. He had not done any work at the court house in an attempt to ascertain any comparable sales on this point. He summed his testimony up by stating: “I only have a general idea of what the owners were asking for lots in that area,” but didn’t know whether they resulted in sales. When cross examined with regard to the method he used in arriving at a valuation, he stated that he did not have his work sheets with him but that he figured the square footage of the house and to that added the approximate value of the porch and garage. He was next asked
“Q. What valuation did you place on the house from a square foot basis?
“A. I think it was somewhere around $8.50.
“Q. You are not sure?
“A. I don’t recall .exactly, but I think it was 8.50.”
This witness’s testimony as to the method of his valuation was somewhat vague and uncertain as he could not remember the exact values he gave various items and could not recall the valuation per square foot on the porch.
On re-direct he testified the house was in excellent condition and that he handled all appraisals for the Bank of Terrebonne, which averaged “thirty to thirty-five” per month.
In summing up this witness’s testimony, we do not find that he qualifies as an expert from the standpoint of special training, nor is there any specific testimony which would give added weight to his qualifications as an appraiser of the subject property. For example, he does not name any property in the general vicinity of the subject property that he had appraised, nor did he use any comparable sales. In fact, his testimony is rather vague as to exactly how he did arrive at the values given by him. We do not wish to cast any aspersions upon his sincerity or his practical experience or competency in his position, but *790 merely that we can almost take judicial knowledge of the fact that he is a very competent, honest and sincere man, however, the exact basis of his valuation of the subject property is not as clear as one would expect from an expert.
Defendants next offered the testimony of Charles D. Chauvin who had been employed by the State to appraise the subject property and had been paid by the State but was not called nor used as a witness for the State. This witness was a resident of Hou-ma and had many enterprises, named "Chauvin Enterprises,” which included the Houma Credit Bureau, Real Estate business, general insurance and representative of the Equitable Life Assurance Society. He was also a licensed real estate agent since 1951, owned some land in the parish and several pieces in the city as well as his own home. He had had occasion to appraise and value property in the City of Houma. Eighty per cent of his business was “real estate.” He had also been employed by the Department of Highways, State of Louisiana, and had placed an estimate of value upon the property to be taken for the construction of a tunnel in the City of Houma, as well as to appraise the subject property. He had submitted his appraisal to- the State of the subject property in writing. He had arrived at a total value of $22,920.00 and when asked if his valuation of the property represented a fair market value he answered:
“A. Mr. Duval, may I answer the question if you will this way. Market value constitutes a willing buyer and a willing seller, and the appraisal which I made on this property is a comparable replacement cost, and the reason why I choose to answer that way for this reason, that it is my considered opinion that if the property was placed on the market for sale that it would bring the amount that I have shown or more. I mean, that is only my opinion.”
In explaining the manner and method in which he arrived'at the value of the property he stated that he valued the lot as a whole at $80.00 a front foot for a total of $9600.00. His appraisal of the house was based upon 1480 square feet of living area at $9.00 per foot for a total of $13,320.00. He placed a value on the garage which had' 350 square feet, a porch 251 square feet at a-cost of $3.00 per square foot on each plus, allowing $1200.00 for improvements such as shrubbery, flowers, fish pond “or what have you,” and estimated the depreciation would be equal to his estimated value of the porch, garage and other improvements such as shrubbery, etc. His data and information were gathered in company with Holland Johnson, a Mr. Mulla of New Orleans, and Daniel B. Eells, the former and latter being appraisers and testifying in. this suit for the State.
This witness’s valuation was not based: on comparable sales in the vicinity or neighborhood although he did testify that he had gone to the court house seeking comparable-sales but could not say off hand how many he had found, and frankly admitted that the testimony which he had given on direct examination with regard to sales on-streets in the vicinity of the subject property without specific measurements or prices, was of a general nature and not with specific reference to any comparable sales. On direct examination his testimony gave the-definite impression that $80.00 per front foot had been generally agreed upon or accepted as part of a valuation of property in - the City of Houma, as a whole, for he said' “Main Street worth so much, so much a front foot, Barrow Street so much a front foot, Lafayette Street so much a front foot, East Park worth so much per front foot.”' Again he stated that the $80.00 value came-from “A lot of sales, comparable sales., There were sales which we know couldn’t be used * * * We used some of the sales. found in the conveyance records. Others, we didn’t use.”
Later in his testimony under questioning-he frankly stated that the $80.00 per front foot was not an official appraisement and'' that if he had given the impression that it. *791 •was an accepted figure “it was wrong.” In view of the fact that he had worked with some of the State appraisers on the subject property, without doubt when he used “we” with regard to some of the sales found in the conveyance records and others “we didn’t use,” he was referring to the sales which will be discussed later on as com-parables used by the State’s expert witnesses.
This witness stated that the neighborhood was very desirable and that he had gone through the house twice with Mr. Eells and once with Mr. Johnson and was thoroughly familiar with the property aside from that fact. It was shown that there were some respectable Negroes who lived in this neighborhood.
After the witness had been questioned at length by counsel for defendants he stated that it was his purpose to qualify the witness as an expert and tendered him to the counsel for plaintiff. In testifying as to his qualifications he reiterated that he had been in the real estate business since 1951, belonged to no professional organizations, that 80% of his livelihood came from the real estate business and the other from the Houma Credit Bureau. Although he did not name any of the clients for whom he stated he appraised property, he stated that it was done “for bonding companies, successions,' banks, religious organizations, individuals, prior to this time for people who were involved in expropriation proceedings for or against the state where they would be involved in expropriation and also have appraised for the state.” He also stated that he made appraisals for Equitable Assurance but that he was not in a position to name the sales he did use, the date of the ■sales nor the parties involved nor the consideration. He frankly testified that the basis of his appraisal of the subject property was a comparable replacement cost.
Defendant next offered the testimony of Nelson Henry, a resident of Houma in the contracting, lumber yard, floor and tile business for approximately five years. For the past four years he stated that he had constructed 2S0 to 300 homes in the Houma area, and that his business operation consisted of buying a piece of ground for a prospective home seeker, building the house and selling the house and lot under strict contract. He had had occasion to buy approximately 35 lots in the three years pre-ceeding the trial in 1958. He had not had any occasion to appraise or value lots but had appraised old houses for people who wished to dispose of them and get a new home in a different area. Based upon the above testimony and some cross examination which in no sense changed the testimony on direct, the District Court ruled that he would “accept him as having special knowledge, certainly more than just an ordinary person, and he can be qualified in a modified sort of sense. His knowledge cannot be utterly disregarded, and the Court will give it whatever it considers its proper weight and value.”
This witness placed a total value of $23,160 on the property, placing a value of $10,000.00 on the two lots, and $12,160.00 on the house and garage, which he considered to be the fair market value. He described the house as being in excellent condition, clean and well kept, well painted, the floors were beautiful, the walls had been painted within the year, roof was in good condition, foundation in excellent condition, “Everything was perfect.”
Counsel for defendants offered, over the objection of the plaintiff, an act of sale for a lot sixty feet front on the north side o'f Point Street by a depth of 122 feet, dated March 25, 1958 from G. Leslie Broussard to Edna Authement for a consideration of $6000.00. The objection of counsel for plaintiff was that no witness that had taken the stand had relied on the sale to bulwark his opinion, nor even used the sale as a comparable sale and no efforts have been made to show whether the sale was comparable or not comparable or where it is located, and nobody had used the sale in testimony as comparable sale. The District Court was of the opinion that the objection *792 was good but in an abundance of precaution allowed the introduction subject to the objection.
Defendant also offered sale dated Feb. 26, 1955 from Mrs. Annette Bourg to Dr. Rudolph Ellender 91 feet front on Belanger Street by a depth of 108 feet for a consideration of $10,800.00. The same objection was made as to the previous sale. The Court felt that this sale was in the same category as the previous sale but in the abundance of precaution allowed the introduction subject to the objection.
The first sale introduced over the defendant’s objection was made after the expropriation of the subject property. It is true that neither sale was used by any witness as a comparable, nor the exact location with regard to the vicinity of defendant’s property nor any other evidence touching upon the two pieces of property. Under these circumstances they can have little effect upon the question before this court.
The first witness offered by the plaintiff was E. Holland Johnson, a resident of Jefferson Parish, a real estate operator and appraiser in real estate for 33 years in New Orleans and the surrounding area including the State of Louisiana. He has an office in the City of New Orleans and had appraised in southwest and south Louisiana, had testified in Court in St. James, St. Charles, Plaquemine, Jefferson as well as Orleans Parish and had made appraisals in the Parish of Terrebonne for the Navy twice. He was a member of the American Appraisal Institute of Chicago, a member and past president of the comparable Louisiana Real Estate Association, and a member of the Board of Directors of his local real estate board. He was a member of the International Federation of Real Estate Brokers and a director therein; member of the American Right of Way Association and had attained the designation of MAI (The record does not show what this stands for) which he stated only came after considerable study and appraisal operations. He has also been a lecturer over the State of Louisiana and at conferences of the National Association and also on a tour in Europe on appraisal procedure. He has also written articles and taught at Tulane University on the subject. He had for clients several insurance companies, U. S. Engineers, private people, for estates, private estates, and he had just finished a large one recently, and for Government agencies as well as private individuals as well as corporations. He had appraised for the FHA, Veterans Administration and for the Justice Department in its condemnation proceedings and had been admitted as an expert and testified in several cases for the Justice Department. He had appraised previously for the Department of Highways and other governmental agencies. He named some of the big properties that he had appraised and he had also appraised property in Hot Springs, Arkansas and two hotels for the Army, also an appraisal in Chicago, 135 N. Wabash, a 24 story building.
There is no question but that Johnson was an expert and admitted to be so by counsel for the defendants, however, the latter thought that to be qualified as an expert to appraise property in Houma, Louisiana, the appraiser had to be familiar with the property values in Houma. The court accepted him as an expert.
The record shows that this appraiser went through the subject property from one end to the other and made a meticulous and careful examination, and he stated that by consideration of comparable sales and studying them in reference to the property, after making due and considered adjustments, he arrived at a figure of $18,700.00.
He found that the property had been sold for $7000.00 in 1947 to the defendants, that the street on Division Avenue and Bond Street was a usual graveled street in that particular section of Houma with shallow ditches for drainage purposes, and although there was no sewerage at the time there was a bond issue and he took that into consideration and added that *793 amount to his appraisal. He carefully-checked the neighborhood and found that there was a distinct difference between certain sections in that area and found a zoning regulation which limited the residential area of Bond Street which bounds the subject property on the north and that is restricted for residential use. He also found that prices were higher north of Bond Street particularly of land values, than they were south of Bond Street, which served as a warning that he should study carefully what caused it. He found that the neighborhood of defendant’s property as far as residential use is concerned was not going up and was not as good as the area between Bond and Belanger to the North of Bond Street. He described the area as a mixed area, that is, with some Negro homes in it. This witness estimated the house to be at least 25 years old, a single house, which had naturally depreciated but stated that it had been kept in good shape and on inspection of the interior and exterior in fair condition for the age of the house. For an old house he described its condition as good. Fie gave a complete description of the house which was shown in a note, supra. He also described the yard as “one of the nicest yards in the neighborhood and I believe she took pride in her yard which was very pretty.” He took all this into consideration in arriving at his valuation. Johnson fixed the valuation of the lot at $50.00 per front foot plus 10% for the corner lot and arrived at a land value of $6300.00 which he stated in his opinion or estimation was the fair market value that would appeal to a buyer knowing the conditions of the neighborhood. On the residence he placed a value of $9945.00, and on the other buildings and improvements $2070.00 which included shrubbery, concrete pavement, and $700.00 for the garage giving a market value of $18,315.00 to which was added the sewerage obligation for a total of $18,700.00.
This witness then detailed nine comparable sales that he used in order to arrive at his valuation of the defendants’ property. He had a list and examined 17 but selected 9. He testified in great detail with regard to these properties which he selected as comparable sales and outlined the general procedure he used in arriving at a unit value for the comparable sales which he subsequently applied to the subject property. With regard to this he testified:
“I considered several properties in the area, and I wish to explain to Your Honor the procedure which is quite simple, and I think is applicable to old houses that do have the depreciation factor. I maintain— I have so all along in my appraisal procedure — that one cannot in all conscience appraise a property, an old house and the new cost and then come up with a depreciation rate figure that would reflect the market value as such of that older house. It can be applied to a new house in an appropriate section where all the neighborhood influences are consonant with the house being built. I think that is quite important. The depreciation in the method I have used embodies the economic, the physical and the functional. By doing that it does reflect, therefore, the market value. To get this unit value I take the sale price of the property, deduct therefrom the land value, and after the land value has been deducted what’s left is the sale value of the house itself. The sale value of the house would, therefore, contain all the depreciation which are inherently to be considered in the sale price unit, and by doing that I have then a unit price that I can apply to a single subject property and multiply that unit against the house measurement which may be at variance with the comparable area, but I will obtain a market sale price of the subject property based upon the sale. Then I add the land value of the subject property which may be more or less than the comparable and come up with what should be a very accurate check on my opinion of value of that property. I want to ask the Judge if I have made myself clear.
*794 “BY THE COURT: Well, I can’t say you didn’t, but you were beginning to lose me.
“A. May I give you an example? Let me take, for instance, one property located at, lets take actual sale at 1409 Point Street. That is close to the subject property, about three blocks away, four blocks away, and that sold at $12,600. It’s in a better neighborhood, concrete block and frame, plaster interior, much newer than the subject, modern bath, floor furnace and so forth. The lot measured 48y¿ by 126 feet. The house measured 1461 feet. The sale price as stated was $12,600. It is located at 1409 Point Street.
“Q. You said about three blocks from the subject property?
“A. Three, Three and a half blocks to the north of tire subject property in a better location. I used all through these com-parables the same $50.00 a front foot which would be in favor upon analysis of the property owner. At $50.00 times 48.5 that means that the land value for that house was worth 2425. This house had a minor improvement of 685, which added to the land value produced a total of 3110, which is subtracted from 12,600, leaving a balance of 9,490, which is the market value of the house by itself. Now, to obtain the sales value of it, no, I beg your pardon. That is the value of the house. The value of the house by itself was 9490. To obtain a unit sale price divide that 9490 of the house area by the area of the house which is 1461 square feet. Therefore, the house had a $6.50 unit value which is the sales market value of that house not including tire lot.
“Q. By using these comparables as far as buildings or residences are concerned you have arrived at a unit value for the comparable sales which you subsequently applied to the subject property?
“A. You have expressed it very clearly in a very short way. That’s what I have been trying to say. Now, applying this unit of the comparable property to the subject property which had 1530 square feet I arrive at a value for the sale price of 9945, but I have to add for the land value-120 feet at $50.00 which would be $6000.00, adding for the corner $300.00, adding for the concrete platform 170 and adding for the minor improvements 1900 I come up,, therefore, with a sale value of the subject property of 18,150 based upon this sale.”
The witness explained that he had followed this same procedure all the way through of getting the unit price, applying-it to the subject, adding for the differences and coming up with the market value of the subject property. He used seven other comparable sales in arriving at the value of the house. The comparable properties-used were inspected, the houses measured, diagrams drawn, the number of feet ira them counted, the yard improvements estimated, “the same as we did the subject property. We were very particular about it and did it as carefully as we knew how.”'
One only has to read the testimony of this appraiser to fully appreciate that he is fully qualified, had put in a great deal of time and effort in his study and examination of tire subject property as well as. a thorough search for comparable sales, and in arriving at the valuation of defendant’s property had offered a sound reason and explanation.
Counsel for the plaintiff next offered the testimony of J. Louis Blouin, a resident of Houma, La., who was engaged in the real estate and insurance business for about ten years and had lived in Houma for about the same time. He had previously been in the real estate business in Lafourche parish with an office in Thibodeaux, was a member of the Louisiana Real Estate Board and the National Association of Real Estate Agents, and designated “Realtor” by the National Association, and a licensed realtor under the law of Louisiana. He had been doing appraisals approximately ten years for the Veteran’s Administration, had done appraisal for Dowell, Inc., Conoco *795 'Oil Company, Esso Standard Oil, Otis Pressure Control, Louisiana Power & Light Company, some individuals and the Terre-bonne Parish Police Jury. He had testified in the State Courts previously and at that time he operated his own real estate office with a salesman and a secretary.
In arriving at his total value of the subject property, which he fixed at $18,522.00, this witness made a careful examination and inspection of the property, of which the following testimony is very illustrative;
“A. Physical condition of the lots. They were completely covered with St. Augustine Grass. Off site improvements two iron clothes poles set in concrete, two A frames, a swing set in concrete for children to swing on, had a fish pond, concrete fish pond, which was approximately 2 feet deep and 11 feet in diameter. Very large pecan tree, pear tree, two fig trees, two Japanese plum trees, a couple banana plants, playpen for children which is constructed of iron posts with chicken wire, seven cedar trees, very large palm tree, three small pines, a number of other miscellaneous native trees, shrubs, and flowers, three large camellias, several other small camellias and azalea plants, large magnolia tree and iron arch arbor over the walk at the front with trailing vines on it.”
This witness arrived at the value of '$50.00 per front foot by making a study of a number of properties not within the same block or immediate vicinity but “because I didn’t find any property sold in the same block, but property let’s say within the general area of the subject lot.” After studying the prices for which these lots were sold and making adjustments which he thought were necessary to make them comparable to the subject property he arrived at a value of $50.00 per front foot.
This witness gave a detailed explanation and reasons for .the valuation of $7500-00 which he placed upon the land.
He arrived at a replacement cost estimate of $9.50 per square foot for the living area and $4.00 for the porch area and $4.00 for the garage which he applied to a total square feet in the main residence living area of 1378, giving a total valuation of $13,091.00; 240 square feet of screen porch, a value of $160.00, and 336 square feet of garage at $4.00 or $1,344 and a total valuation before depreciation of $15,395.00. He used a depreciation of 30% based upon 100 years at 1% and estimating the building to be thirty years old, which resulted in a current market value of $10,776.50. To this he added the $235.00 for 483 square feet of concrete walk which gave him a total for all improvements other than the lot of $11,022.50 which he added to that value giving a total of $18,522.00.
The witness then detailed the market date valuation of comparables sales method which he also used in order to arrive at the value. He stated that he used several com-parables, one of them was 2 blocks north and one lU/i blocks east, another one was 21/2 blocks east and 2 blocks north, and another was 3 blocks south and 2 blocks east, another was 2 blocks south and 1 block east, then there were several of them scattered all up in front of a park close by. He testified that these properties could be considered comparables, but “they had to be adjusted to .the subject property.” He made these adjustments and arrived at a value of $50.17 per front foot which he rounded to $50.00 per front foot for the property. He testified in detail with regard to these comparables, and why and how he arrived at $50.17 per front foot.
Defendant’s next witness was Daniel B. Eells, a resident of Houma for some 28 years, engaged in appraisal work and as an inspector of construction. He had done ap-prais.al work for Equitable Life Assurance Society in handling about three and a quarter million dollars worth of residential loans in the Thibodeaux and Houma area, and also for Jefferson Standard Life Insurance Company whom he still represented in appraisal work, and inspection. This witness had also appraised for individuals and contractors. He belonged to *796 the Society of Residential Appraisers, Chapter 126 of New Orleans and had taken a three weeks course given by the American Institute of Appraisers the previous summer.
This witness had made an inspection of the property along with Chauvin, Lameula and Holland Johnson in December, which he referred to as the ground work on the appraisal of inspecting the property, measuring it, taking age into consideration and actually started making their estimate in January of 1957.
As a basis for concluding that the total value of the house and improvements was $19,106.35, this witness used what he termed a cost analysis breakdown on reproduction which he stated "could mean constructing a similar house with similar materials on a comparable lot.” He testified in detail as to how he arrived at this valuation using the “reproduction” theory. However, he testified that he checked the first valuation by using three comparables. He stated that he could not find anything “right in that area that was actually comparable to this house, so the insurance companies tell you if you can’t find anything in the immediate area to go to other areas or even restricted subdivisions and adjust them through a percentage breakdown.” It appears that the first comparable was “About half a mile across the canal on Grand Cail-lou Highway fast building area next to the tunnel, like the subject property, high restricted area, no racial condition of any kind.” The witness testified that he made adjustments on this comparable in order to bring it into line with the subject property, however it would seem that this comparable was too far from the subject property.
The second comparable was in the same subdivision which would be the same distance.
The third comparable was only 4i/£ blocks from the subject property in a restricted residential area. Eells stated that he applied the necessary adjustments in order to reach a conclusion of the market value of the third comparable. “The house came to $11,633.59 and the lot is 48.5 feet at $70.00 a front foot. It’s up in a better area near a park and in a restricted residential area in the City of Houma. It comes to $3395.00 or total for the house market value today if they want to resell if it should sell for $15,-028.59. The adjustment on this house would be you have to, the comparable house has 1386 square feet in it, which is 94 feet, square feet, less than the subject we are dealing with. Therefore, you have to add 94 square feet at base rate of $7.89 or $741.-60, depreciation at 15% or less $111.25 or $630.41 added to the total of $11,333.59 or grand total of $11,964.00. This is $158.00 more than the subject property and this will be taken care of because of the fact that interior partitions in this comparable just mentioned are all plastered. They are not sheetrock.”
This witness used five comparables in order to arrive at the land value. His first comparable was the sale from G. Leslie Broussard to Mrs. Edna Authement, Lot 8, Block 6, Honduras Addition to the City of Houma, size 60 feet by 122.2 feet, on a paved street with walk and curb, restricted residential, good neighborhood, 1^4 blocks from Shady Oak Park, purchased March 25, 1958 for $6000.00 and was 2j4 blocks from the subject property. This is the same sale which was offered in evidence in the beginning of the trial and although the judge at that time did not think it was admissible, in the abundance of precaution he allowed its introduction.
The next comparable which this witness used was sold on March 18, 1958 by Pitre to Glasson or Glassen, being Lot 4 of Block 26, Honduras Addition, measuring 62.5 by 180 feet deep and was a corner lot between six and eight blocks east southeast of the subject property. The lot was larger than the subject and it sold for $3000.00.
The next comparable was the sale on February 25, 1952 of a lot 62}4 by 180 feet at the corner of Dun and Dewey which was 1/3 larger than the subject lot and the pur *797 chase price was $1500.00. The exact distance from the subject property is not given.
The next comparable was a sale from one Smith to Glover on August 27, 1955 of a lot measuring 60 x 120 feet on Short Street with the same utilities comparable to the subject lot and in Celestin Addition for $1400.00, and about 10 blocks south in an all white neighborhood.
The fifth comparable was one sold by Phillip Daspit to the City of Houma, Jan. 26, 1956 for $29,700.00 on which was later located an auditorium by the City of Hou-ma, and “to put this raw land on a comparable basis with the subject property, in other words, develop it it would cost $860.00 per lot. That’s Shell Street, no sidewalk, fire hydrants, just as the comparable property is plus $208.00 for sewerage assessment and $60.00 for survey per lot, which would give you $3712.00 per lot value. Wait a minute. Let me make a correction there. After dividing, getting the number of lots which would be 8 lots out of this land you would have $3712.00 lot value plus these other items I mentioned. You would come up with $4800.00 for 60 x 120 lot comparable to the subject property.”
The witness was then asked if those were all his comparables and he answered:
“A. Yes, sir, but I want to show you the trend. This is the trend from a better area to an area behind the subject property which is comparable to the subject property. You have 5 lots. After adding all the values cited hereinabove divided by 5 you get $3350.00 per lot 60 lineal feet front, and you divide that by 60 feet and you come up with $56.00 per front foot and in this property you are considering 2 lots 331/3% larger which would adjust to $6.00 and you would come up with a flat trend of $50.00 per front foot.”
The witness was subjected to close and searching cross examination but readily gave his reasons and again explained his methods of adjustments to fit the subject property.
Let us apply the rules laid down in State v. McNeely, supra, which were a summation of the jurisprudence on the subject. The defendants claim the value of their expropriated property is in excess of the estimate and amount deposited in the registry of the court by the State, and under the settled jurisprudence they must adduce convincing evidence that the value is in excess of that shown in the estimate upon which the Department of Highways made the deposit.
An examination of the qualifications of the experts giving testimony preponderates in favor of those testifying on behalf of the State in experience, educational background, and the careful and methodical manner in which they inspected the property and the neighborhood, and the amount of time given to studying and appraising the property and the consideration of other sales of comparable property in the vicinity, whereas, the witnesses on behalf of the defendants did not have the varied experience nor equal educational qualifications in the specific line of appraisal work, as the State’s experts. For example, the bankers appraised property merely for the purpose of loans of money and their appraisal in this case was not on a comparable sales basis which the law says is to be preferred, but on their individual judgment, and they had been requested to make the appraisals not for the purpose of lending money. We do not mean to doubt the sincerity of any witnesses testifying but are making a matter of fact comparison of their qualifications and the manner and method used by each in arriving at his valuation. Mr. Chauvin’s testimony was most general and he admitted that he could not give as a basis one comparable sale.
It is also clear from the record that the qualifications of Mr. Nelson Henry did’ not begin to equal those of the plaintiff’s experts from the standpoint of appraisal experience, educational background in appraisal work, nor in the time and careful consideration given to all of the necessary details that reveal an expert touch, such as *798 'inspection, of the neighborhood and the comparable sales in the vicinity of the subject property.
We also believe that under the settled jurisprudence this Court should accept the testimony of the experts who arrived at a valuation based upon comparable sales and on the whole, with few exceptions, we believe that the comparable sales used as a basis for arriving at the value of the subject property by the experts for the State were comparable whereas the witnesses for the defendants did not use the comparable sales method, and even though Mr. Chauvin was employed to make an appraisal on behalf of the State, a comparison of his testimony with that of the three experts who testified on behalf of the State reveals specific comparables used by the latter and no specific comparables could even be given or remembered by the former.
We are not considering a case where the witnesses or experts used on behalf of the State were “foreigners” so to speak, but two of the three were residents of Houma, Louisiana, just as were the witnesses on behalf of the defendants. We do not doubt the ability of the witnesses testifying on behalf of the defendants, but this record reveals that the State’s witnesses used a ■specific and approved method in arriving at their valuations, and gave detailed reasons therefor, whereas the defendants’ witnesses did not follow a particular pattern.
As to the valuations given by the State’s witnesses on improvements, they vary from a high of $13,016.35 to a low of $9,945.00. We believe that the valuations of improvements by Johnson is too low and an average of the three would be proper. We therefore value the improvements at $11,326.92. As to the land we are definitely of the opinion that Eells’ valuation of $6100.00 should not be considered, being too low, possibly because of the use of some comparables in arriving at this value that we do not consider comparables. We believe that Johnson’s valuation of the land should be accepted without averaging two out of the three valuations of the State’s witnesses. We therefore fix the value of the land at $8,789.00, making a total valuation of $20,-115.92.
Accordingly the judgment of the District Court is reduced from the sum of $22,820.00 to $20,115.92, and it is therefore, ordered, adjudged and decreed that there be judgment in favor of the defendants in the full sum of $20,115.92 less a credit of $18,-700.00, the costs of this appeal to be paid by the defendants, and all other costs to be paid by the plaintiff.
Amended and affirmed.

. It is agreed by all appraisers that the land or lot was 120 feet deep, had quite a number of large trees and some small trees, some camellias and other shrubbery, and that the residence was in a good ór excellent state of repair and the interior very attractive and well kept. The residence had three bedrooms, a bath on one side, a living, dining room, kitchen, wash room in the back of the kitchen, and a glass enclosed lean-to porch in the back of the kitchen and a rear bedroom. There was a front porch almost 20' by 12'. There was a garage in the rear and also a concrete slab in the back T x 30' and a concrete walk 92 lineal feet long and 3 feet wide and another 30' x 4' wide. The main bouse had asbestos shingles and galvanized iron crimp over the porch, solid concrete pillar piers as a foundation, sheet rock interior and painting; also pine screen porch. Exterior -was frame and weather board. The casings were hand made casings in the main. Single polished floors, linoleum on the enclosed porch floor, kitchen cabinets were metal 9' 6". Kitchen Eloor was inlaid linoleum and the bath room had rubber tile with wainscoting of plastic tile, picture molding in the living room and dining room and cedar lined seats in the front room. There was also a fire place in the living room.