HAWTHORNE, Justice.
This suit was instituted by the Louisiana Department of Highways in 1954 to expropriate certain parcels of land owned by the defendant Hub Realty Company, Inc., for the construction of a limited access facility known as the Carrollton-Airline Interchange. Hub Realty Company owned all of Squares 644, 618, and 619 in the Seventh District of the City of New Orleans, and the Department sought to expropriate all of Square 644 and parts of Squares 618 and 619. Hub Realty Company contested the expropriation, alleging that there was no necessity for the taking because the quantity of land sought by the Department exceeded that which was reasonable and necessary for the construction of the Car-rollton-Airline Interchange and because plaintiff had available all the property necessary for its purposes. In the alternative defendant prayed that if the court should conclude that plaintiff is entitled to the property, defendant should be paid compensation for the property taken and damages suffered in an amount in excess of $2,000,000.
After trial in the lower court there was judgment fixing the market value of the property expropriated at $129,620.30 and the damages to the defendant’s remaining property at $373,383.23, and decreeing that upon the payment of the total amount of this judgment — that is, $503,003.53 — into the registry of the court for the use and benefit of the defendant as full compensation for the value of the rights expropriated and damage suffered thereby, there be adjudged to the State of Louisiana the full ownership of the property sought to be expropriated together with the right to *366 deny direct access from the defendant’s remaining property to the Pontchartrain Expressway and to South Carrollton Avenue.
From this judgment defendant Hub Realty Company appealed. In this court defendant-appellant still contends that there was no necessity for the taking, and contends in the alternative that if the court should conclude that the plaintiff is entitled to expropriate the property, then the award for the property actually taken and for damages to the remaining property should be increased to $1,114,907. The Department of Highways has answered the appeal praying that the amount awarded to defendant as damages to its remaining property be decreased either to $182,317.05, the average of the damages found by plaintiff’s three experts, or to $187,660, the highest figure arrived at by any of these experts.
As stated, appellant is still urging its special defense that there was no necessity for the Highway Department to take its property, but we seriously doubt that this question is properly before us on this appeal. It was conceded in argument before this court that the defendant had withdrawn from the registry of the court for its own use the money deposited therein which represented the market value of the property expropriated as found by the lower court, and it is also conceded that the construction of this phase of the Carrollton-Airline Interchange has been completed. Even if this question is properly before us, however, we do not find that there is any merit in the special defense.
In support of its special defense appellant offered in evidence an alternative plan for the proposed structure prepared by its engineers, under which the improvements could be constructed entirely on public property. In other words, appellant contends that the design of the Department of Highways for this limited access facility was improper and should be changed so that the facility would fall within existing streets rather than upon any portion of appellant’s property. Appellant is therefore challenging the propriety of the location of the proposed project, and would substitute its own design or plan of the limited access facility for the plan prepared and approved by the engineers of the Department of Highways.
The proposed interchange is clearly a limited access facility as that term is defined in R.S. 48:1(12) — that is, it is a highway or street especially designed for through traffic over, from, or to which owners or occupants of abutting land have no right or only a limited right or servitude of access by reason of the fact that their property abuts thereon. R.S. 48:314 provided before its repeal in 1951[1] that the Department of Highways might design any limited access facility and regulate, restrict, or prohibit access so as to best serve the traffic for which it was intended, and that its determination of a design for such limited access facility was final. Under these statutes appellant cannot be heard to question the design of this limited access facility prepared by the Department of Highways.
The Department of Highways established that the plan under which the interchange was to be constructed was adopted by it after considerable study, that the expropriation was necessary, that the quantity of land taken was not excessive, and that the location of the project was proper and necessary and in the best interest of the general public. Since these facts were established by ample proof, the trial judge properly rejected appellant’s special defense.
We now come to a consideration of the award made by the trial judge for the property expropriated and the amount allowed as consequential damages to defendant’s remaining property.
The property actually expropriated consists of irregularly shaped parts of Squares *367 618 and 619 and all of Square 644 in the Seventh District of the City of New Orleans. Squares 644, 618, and 619 were owned by the defendant Hub Realty Company, Inc. All of these squares are shown on the following- plat, on which the parcels expropriated by the Department of Highways are marked by heavy lines.

*368 The record shows that the highest and best use of the property owned by defendant was as a regional shopping center. This fact is not disputed, and probably no other property in New Orleans compared with this property for such a purpose. The property was vacant, zoned “J Light Industrial”, and near the geographical center of Metropolitan New Orleans. The lands were at grade, provided with all utilities and with convenient public transportation, and no other property of this type comprising such a large area was available anywhere else in the vicinity. The property was bounded on the River side by Carrollton Avenue, one of the main thoroughfares of New Orleans, and was also served by Pontchartrain Boulevard, Washington Avenue, and Palmetto Street, all principal thoroughfares. There are a number of business establishments in the immediate vicinity, and one of these, a chain grocery store, had the largest volume of business of all the 4000 or so stores owned by the chain throughout the United States. There can be no question that this property was extremely valuable and highly desirable, and as stated previously, its highest and best use was as a shopping center.
Value of Property Expropriated.
In expropriation suits the measure of compensation to be awarded for the property taken is the market value of that property — that is, the price which would be agreed upon at a voluntary sale between an owner willing to sell and a purchaser willing to buy. Most important in determining this market value are sales of similar or comparable properties in the neighborhood. If evidence of similar sales is not available, the value of the land expropriated must be determined by other means, generally the testimony of experts. The rule here is that the testimony of each expert should be given effect if that testimony appears to be well reasoned and sincere. However, if the expert testimony impresses the court unfavorably, it will be disregarded. Housing Authority of New Orleans v. Boudwine, 224 La. 988, 71 So.2d 541; Domino v. Domino, 233 La. 1014, 99 So.2d 328; State v. Grand Consistory, 237 La. 1005, 112 So.2d 692.
The values placed on the property by the plaintiff’s experts and by those of the defendant are far apart. Plaintiff’s experts fixed the value of the property taken at amounts varying from $123,138.83 to $133,-000. Three of defendant’s experts, on the other hand, valued the property at $496,-127, and another at $221,869.
The plaintiff’s experts were all well qualified and experienced real estate appraisers and dealers. Before forming an opinion as to the value of the property expropriated at the moment of taking, each one inspected the property in the neighborhood, gave a considerable amount of time to studying and appraising the property, considered other sales of comparable property in the vicinity, studied the planning and development of shopping centers, and concluded that the highest and best use of the two squares was as a shopping center because of the large area and because of their situation near another shopping center and on natural arteries of traffic. The value placed on the property by each of these experts was, in his opinion, its market value — that is, the price which would be agreed upon at a voluntary sale between an owner willing to sell and a purchaser willing to buy. One of these experts valued the property in Square 618 at $4.85 a square foot and the property in Square 619 at $4.60 a square foot. Another valued the property in both of these squares at $4.56 a square foot, and' still another appraised the property in these two squares at $5 a square foot. It will' thus be observed that these experts were not far apart in their appraisals of its-value.
The wide difference in the valuation of' this property by the experts for plaintiff and by those of the defendant resulted from, the different methods of approach by the two groups of experts. Plaintiff’s experts used the comparable sales method together *369 with other factors in arriving at their valuation of the property, and defendant’s experts used the rent capitalization approach.
The trial judge disregarded the testimony of defendant’s experts as not being based on proper foundations, and we think he was correct. Defendant’s experts in arriving at their valuations (which ranged from $7 a square foot for Square 618 and $9 a square foot for Square 619 to $8.33 a square foot for the property in both squares) projected and constructed on this vacant and unimproved land an imaginary shopping center. Then after considering the cost of its construction, etc., they capitalized imaginary rents from imaginary buildings, and from these figures determined the present value of the property on what they termed the “rent capitalization method”. In discussing the testimony of these experts the trial judge in his reasons for judgment correctly stated:
“In this case, the property involved is unimproved land. It is true that its highest and best use is for a shopping center. Nevertheless, there is no shopping center there today. In arriving at their values, the experts for defendant constructed and operated an imaginary shopping center.; they capitalized the imaginary rents from imaginary buildings to be constructed hereafter at imaginary prices to be determined after the submission of imaginary bids, based on imaginary specifications, not yet drawn. Even the imaginary rents to be derived therefrom were calculated for the greater part on the basis of a percentage of imaginary gross business to be done in this imaginary shopping center, under imaginary, unknown economic conditions. In expropriation proceedings, no compensation is awarded for business losses, even though the business is in actual operation at the time of the expropriation proceedings. No compensation is awarded for the loss of actual rents based on a percentage of actual business being done. Still less can compensation be awarded for speculative and imaginary business losses. The only compensation that this court can award is the actual market value of the land taken in the condition in which it is today and not as it will be hereafter in a promoter’s dream.”
The trial judge concluded that the property owned by the defendant had a value before the taking of $4.80 a square foot (the average of the values as fixed by plaintiff’s experts). Using this figure as a basis, he computed the total value of the property actually taken to be $129,620.-30, and we think his finding in this respect is amply supported by the evidence adduced at the trial of this case.
Defendant strenuously argues that the testimony of its experts should have been considered by the trial judge, and cites in support of this argument Mattydale Shopping Center v. State, 303 N.Y. 974, 106 N.E.2d 59, and United States v. 25.406 Acres of Land, 4 Cir., 1949, 172 F.2d 990, 994. Neither of these cases is apposite or pertinent here. One of these very cases in discussing testimony of expert witnesses which should be rej ected said:
“We do not mean to say, of course, that an expert witness should be allowed to roam at large in the realms of fancy and testify at length about hypothetical developments and mythical income to be realized therefrom. When this is attempted it should be firmly suppressed because of its tendency to mislead and confuse and the waste of time involved. * * * ” See United States v. 25.406 Acres of Land, supra.
This is the kind of testimony which defendant here sought to elicit from its expert witnesses.
In a supplemental brief counsel for Hub contend that in Orleans Parish School Board v. Patemostro, 236 La. 223, 107 So.2d 451, an expropriation case in which there were no recent sales of property comparable to the property being expropriated, the court adopted as its judgment the apprais *370 al of a realtor which was based entirely upon the capitalization of proposed rentals theory. Paternostro is clearly distinguishable from the instant proceeding in that the land to be expropriated there had on it at the time of the taking a one-story building, one-half of which was a five-room residence and the remainder of which was devoted to a bar and cocktail lounge, a restaurant and kitchen, a barber shop, and a garage, all of which were available for renting for commercial uses. In other words, in Pat-ernostro this court allowed in evidence an appraisal of market value based on capitalization of actual income, not imaginary income, such as the landowner’s experts in the instant suit use as a basis for their calculations.
Damages to Defendant’s Remaining Property.
It is well settled that when property is expropriated, the owner is entitled to compensation for damages to his remaining land caused by the taking. Lafayette Parish, etc. v. Hernandez, 232 La. 1, 93 So.2d 672, and authorities cited. The measure of such damages is the difference between the market value of the remaining property immediately before and its market value immediately after the expropriation. Harrison v. Louisiana Highway Commission, 191 La. 839, 186 So. 354; Texas Pipe Line Co. v. Barbe, 229 La. 191, 85 So.2d 260; Lafayette Parish v. Hernandez, supra; Texas Gas Transmission Corporation v. Broussard, 234 La. 751, 101 So.2d 657.
Defendant’s property before the taking had a value of $4.80 a square foot, as stated above, and on this basis the remaining property in Squares 618 and 619 had a value of $791,072.79 before the expropriation. Next we must determine the fair market value of the remaining property after the taking, and the difference between these two figures will represent the actual damages to the owner’s remaining property as a result of the expropriation.
In considering these damages we must remember that the judgment of expropriation' gave to the Department of Highways the right to deny direct access from defendant’s remaining property to the Pontchartrain Expressway and to South Car-rollton Avenue, and that the property actually expropriated for the Carrollton-Air-line Interchange was to be used for the construction of a descending ramp and the approaches thereto on the Peach Street and Carrollton Avenue sides of defendant’s remaining property.
As stated in State of Louisiana Through Department of Highways v. Central Realty Investment Co., Inc., 238 La. 965, 117 So. 2d 261, 263, “Our jurisprudence is well established that the measure of compensation to be awarded in expropriation cases is the market value of the property- — -that is, a price which would be agreed upon at a voluntary sale between a willing seller and purchaser (see Housing Authority of Shreveport v. Green, 200 La. 463, 8 So.2d 295; City of New Orleans v. Noto, 217 La. 657, 47 So.2d 36; Housing Authority of New Orleans v. Boudwine, 224 La. 988, 71 So.2d 541 and many other cases too numerous to mention) and that sales of similar and comparable property within the vicinity offer the best guide in determining the market value to which the owner is entitled. See, in addition to cases above cited, Texas Pacific-Missouri Pac. Terminal R. R. of New Orleans v. Dittmar, 161 La. 444, 108 So. 877; State v. Ferris, 227 La. 13, 78 So.2d 493; Caddo Parish School Board v. Willer, 227 La. 201, 78 So.2d 833; Recreation and Park Commission v. Perkins, 231 La. 869, 93 So.2d 198 and Mississippi River Bridge Authority v. Curry, 232 La. 140, 94 So.2d 9.” (Italics ours.)
In the record in the instant case we find a recent sale of similar or comparable property within the. vicinity. This sale, made by the Roman Catholic Church of the Diocese of New Orleans to the Central Realty Investment Co., Inc., included Squares 617 and 620, which are located directly across Dublin Street from the remaining property of defendant here (see plat), and this sale offers the best guide *371 and is most important in determining the market value of defendant’s remaining property after the expropriation. This is true because defendant’s remaining property in Squares 618 and 619 can no longer be considered as property fronting on Car-rollton Avenue, since the right of access from this street could be denied pursuant to the judgment of expropriation, and must now be considered as property facing Dublin Street. The trial judge was of this view and used this sale in his determination of the value of defendant’s remaining property after the taking. On the basis of the same price per square foot as in the Catholic Church sale, he calculated that defendant’s remaining property would have a value of $334,151.65. He concluded, however, that defendant’s property on the River side of Dublin Street had a 25 per cent higher value than the church property on the Lake side of Dublin Street “since it is nearer to Carrollton Avenue and, for that reason, has a greater advertising value, since it can be seen by a greater number of pedestrians and persons using vehicular traffic”. (Italics ours.) He therefore added to $334,151.65 25 per cent of that figure and concluded that defendant’s remaining property after the taking had a total valuation of $417,689.56. In other words, the trial judge concluded that the remaining property of defendant, for the reason given above, had a one-fourth, or 25 per cent, greater market value than the property in Squares 617 and 620.
We agree that the remaining property of defendant in Squares 618 and 619 has a greater value on account of its nearness to Carrollton Avenue than the property in Squares 617 and 620. We think, however, that 25 per cent is too great an allowance for this factor because the judgment of expropriation gives the Highway Department the right to deny access to this property from Carrollton Avenue, because the property expropriated was to be used for the construction on the Carrollton side of defendant’s property of a descending ramp and approaches, because the property could no longer be considered as abutting on Car-rollton Avenue, and because the construction of the proposed ramp will somewhat obstruct the view from Carrollton Avenue.
To the value of defendant’s remaining property computed on the basis of the Catholic Church comparable sale, we think it would be fairer and more just to allow an additional 10 per cent rather than 25 per cent because it is nearer to Carrollton Avenue. With the comparable sale as a basis — that is, the same price per square foot as in the Catholic Church sale — , the defendant’s remaining property would have a value, as stated previously, of $334,151.65. The addition of 10 per cent to this amount would bring the market value of defendant’s remaining property after the expropriation to $367,566.82. Since the measure of damages is the difference between the market value of this remaining property immediately before and its market value immediately after the expropriation, the amount of the damages to be awarded defendant is $423,505.97.
In this suit, as in the companion suit, State Through Department of Highways v. Central Realty Investment Co., Inc., supra, the contention is made that the sale by the Catholic Church which included Squares 617 and 620 is not determinative of the value of the land involved as the sale was not “on the open market”. This contention has been fully considered and found to be without merit in the Central Realty Investment Co. case, and we see no reason to discuss it here.
The Department of Highways, which in its answer to the appeal seeks a decrease in the amount awarded to defendant as damages to its remaining property, asks us to accept the testimony of its experts on the market value of the remaining land immediately after the expropriation. As has been said on numerous occasions by this court, sales of similar or comparable property in the vicinity offer the best guide and are most important in determining market value. We have considered this best evi-' *372 dence and used it in finding the value of defendant’s remaining property.
For the reasons assigned the judgment appealed from is amended by increasing the amount awarded as damage to defendant’s remaining property from $373,383.23 to $423,505.97, and as thus amended the judgment is affirmed. Plaintiff-appellee is to pay all costs.
VIOSCA, J., recused.

. See R.S. 4S:302.