**CITY OF THIBODAUX**
**v.**
**LOUISIANA POWER & LIGHT CO.**
Civ. A. No. 6444.

United States District Court
E. D. Louisiana,
New Orleans Division.
Dec. 4, 1963.

658

Jos. Loret, Baton Rouge, La., Remy Chiasson, Wollen J. Falgout, Thibodaux, La., Theo. F. Cangelosi, Baton Rouge, La., for plaintiff.

John Peltier, Jr., and Monroe & Lemann, Andrew P. Carter, Eugene G. Taggart, New Orleans, La., for defendant.

FRANK B. ELLIS, District Judge.

On February 4, 1957, the City of Thibodaux, State of Louisiana, a duly incorporated municipality (hereinafter referred to as "City") brought suit to expropriate the electrical power distribution system of the Louisiana Light & Power Company (hereinafter referred to as "Power Company") within the corporate limits of the City pursuant to Louisiana Revised Statutes, Tit. 19:101, LSA, which reads in pertinent part:

> Any municipal corporation * * * may expropriate any electric light, gas or waterworks plant or property.

 The Power Company removed the suit to the United States District Court for the Eastern District of Louisiana,[1] premised on the original diversity jurisdiction of this Court since Power Company was a citizen of another State under 28 U.S.C. § 1332.[2] Answer was filed and the matter set down for hearing. By Minute Entry of May 15, 1957, it was stipulated that the seizure would be pursuant to Rule 71A F.R.Civ.P. and that a commission of three would be appointed to determine the value of the property, should that issue be reached. It was further agreed that Power Company would be heard on all its defenses at a special hearing.[3] Subsequent to the hearing the District Judge then presiding stayed all further proceedings pending a determination by the Louisiana Supreme Court of the limited application of La.R.S. 19:101, LSA to the expropriation of the facilities of Power Company within the city limits of the City, on the grounds that the paucity of Louisiana law on the subject statute[4]

1. 28 U.S.C. § 1441.

2. Power Company's removal petition stated that it was a resident of the State of Florida and incorporated there. This allegation was sufficient for diversity under the Statute in 1957. Subsequently, by the 1958 Amendment to 28 U.S.C. § 1332, a corporation became a citizen, for diversity purposes, of the state of its principal place of business which in Power Company's case is Louisiana. However, the subsequent change does not now affect this Court's jurisdiction.

3. Power Company's defenses generally stated, were that the act of expropriation was unconstitutional as an impairment of contract under Section 10, Art. 1 U.S.Const. and that the statute, if properly construed to countenance such a

seizure, was similarly unconstitutional. It was also urged that the procedure for condemnation proposed by the City was unconstitutional as a taking of property without due process. U.S.Const. Amend. 14, and that no finding of "necessity" for seizure had been made. The Power Company finally urged that under the statutes of the State of Louisiana a municipality could not seize only a portion of the Power Company, as it proposed to do, but seize the whole of the Company's property.

4. The Statute, in its entirety, is as follows:
La.R.S. 19:101 et seq. "Any municipal corporation of Louisiana may expropriate any electric light, gas, or waterworks plant or property whenever such a course

advised reference of a crucial state law problem to the State Court.[5] The Fifth Circuit Court of Appeals reversed the District Court on the grounds that abstention was unavailable and inappropriate under the circumstances.[6] The Supreme Court of the United States reversed the Fifth Circuit and affirmed the District Court's abstention of jurisdiction pending determination of the applicability of the statute by the Louisiana Courts.[7] Subsequently the right of the City to expropriate the property involved was confirmed by the Louisiana courts and the matter returned to the federal District Court.[8]

A commission of three was appointed and ordered to take testimony and file a report which was to contain "not only the opinions as to value, but also the detailed considerations of which these opinions [were] based." On May 26, 1961, the District Court issued a "Charge to the Commission" setting out the considerations which were to govern the Commission in its determination of the value of the property to be expro-'priated. Both the City and Power Com-

---

is thought necessary for the public interest by the mayor and council of the municipality. When the municipal council cannot agree with the owner thereof for its purchase, the municipal corporation through the proper officers may petition the judge of the district court in which the property is situated, describing the property necessary for the municipal purpose, with a detailed statement of the buildings, machinery, appurtenances, fixtures, improvements, mains, pipes, sewers, wires, lights, poles and property of every kind, connected therewith, and praying that the property described be adjudged to the municipalty upon payment to the owner of the value of the property plus all damages sustained in consequence of the expropriation. Where the same person is the owner of both gas, electric light, and waterworks plants, or of more than one of any one kind of plant, the municipal corporation may not expropriate any one of the plants without expropriating all of the plants owned by the same person.

"All claims for damages to the owner caused by the expropriation of any such property are barred by one year's prescription, running from the date on which the property was actually taken possession of and used by the political corporation."

5. This legal problem grew, no doubt, out of technical progress and the rural electrification of the State of Louisiana. When the statute was passed as Act III of 1900 power companies normally served the public from within a municipality. With time and progress, the Power Company now has facilities the length and breadth of the State with generators and sub-stations serving municipalities now located outside the municipality. An opinion of the Attorney General of the State of Louisiana rendered October 10, 1951, stated that the City could not do what it sought to do here. The District Court, although neither party requested it, stayed the proceedings in the federal court so that a definitive judgment on state law could be made by the Louisiana State Courts. City of Thibodaux v. Louisiana Power & Light Co., E.D.La., 153 F.Supp. 515.

6. The Fifth Circuit read the law as holding that abstention was appropriate when the action was equitable or the discretionary procedure desirable. It found neither in the case at bar. City of Thibodaux v. Louisiana Power & Light Co., 5 Cir. 255 F.2d 774.

7. Granting certiorari "because of the importance of the question in the judicial enforcement of the power of eminent domain under diversity jurisdiction" 360 U.S. at 26, 79 S.Ct. at 1071, 3 L.Ed.2d 1058, the Supreme Court affirmed the application of abstention principally because of "the special nature of eminent domain" and the wise use of reference of the question to the State courts by the District Judge. Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058. It is important to note that the constitutional defenses raised by Power Company, which had not found countenance in the District Court, Court of Appeals or the Supreme Court, were labelled "frivolous" in the dissent, 360 U.S. p. 33, 79 S.Ct. p. 1075, 3 L.Ed.2d 1058, and dismissed without more. If the parties still consider the issue live in this court, the point must be made now that these constitutional defenses are rejected as unsound. See City of Thibodaux v. Louisiana Power & Light Co., La.App., 126 So.2d 24, reh. den., Jan. 30, 1961, cert. den. Mar. 13, 1961.

8. City of Thibodaux v. Louisiana Power & Light Co., La.App., 126 So.2d 24.

pany filed objections to the Charge and on June 6, 1961, the District Court entered an Amended Charge.[9] After the presentation and submission of proposed findings by the parties, the Commission filed its first report on August 21, 1961. Both the City and the Power Company took exception to the Commission's report and after a hearing the District Court, on February 8, 1962, referred the matter back to Commission for the purpose of answering certain specific interrogatories. On February 28, 1962, the Commission filed its Supplemental Report on valuation in response to the District Court's interrogatories. Once again the City and Power Company filed specific objections to the Supplemental Report. On March 27, 1962, the District Court overruled the objections of the City and Power Company to the Supplemental Report of the Commission. No formal judgment was entered. Thereafter the Commissioners' fees were fixed by the District Court.

Both the City and Power Company moved for a new trial [10] and on October 24, 1962, the matter was heard before the District Court as presently constituted, arguments being heard and the testimony of one witness for Power Company being heard. The matters presented were the correctness of the Commission's valuation of the expropriated property and the justification of the Power Company's costs representing expert fees. It is the cross-motion for a new trial which is presently before this court for determination.

9. The objections raised then have continued at varying degrees of intensity and in various forms ever since. Generally they center around, 1) the time at which the taking value was to be measured, 2) the value, or lack of value, of the franchise, 3) the value and significance of future growth of the Power Company, 4) the definition of severance and consequential damages.

10. Motions for new trial are made under the Federal Rules within ten days after judgment has been entered. No judgment has been entered in this case. Rule

## PART II

Before delving into the facts of this matter it is important to set out the limitations of the review of the Commissioners' findings on this cross-motion. Under the stipulated application of Rule 71A F.R.Civ.P., the Commission appointed by this Court was governed generally by Rule 53 F.R.Civ.P., and this court, in reviewing the findings of the Commission is bound by Rule 53(e) (2) F.R. Civ.P., which states in pertinent part:

"(2) In Non-Jury Actions. In an action to be tried without a jury the court shall accept the master's findings unless clearly erroneous. * * * The court after hearing [objections] may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions."

As to the limits of this Rule, Professor Moore has stated:

"The 'unless clearly erroneous' provision of Rule 53(e) (2) is a mandate to the trial court in passing on the master's findings of fact, and prescribes substantially the same test which Rule 52(a) applies to the findings of fact of the District Court on appeal.

"Although Rule 53(e) (2) is a mandate to the trial court, failure to observe the Rule will result on appeal in reversal or modification of the trial court's judgment. The master's findings must be read reasonably; and, although some are defi-

53(e) (2) provides for motions on objections to the Commission's reports. This procedure has been followed and determined by Minute Entries of March 27, 1962. At best this procedure must be called a Petition for Rehearing and this Court is constrained to observe that this petition was filed after the Honorable J. Skelly Wright had been elevated to the Court of Appeals. It seems appropriate at this point for this Court to observe that it gives great weight to the prior findings of this Court and the Commission.

cient, those that are adequate come within the provisions of Rule 53(e) (2), unless the report is rejected modified, or recommitted."

Of course, it goes without saying that conclusions or applications of law are fully within the power of this Court to alter if it is demonstrated that the Commission was in error. To this extent, then, this Court must accept the report of the Commissioners unless clearly erroneous and modify or reject the report in whole or in part and apply the law properly if the Commission did otherwise.

■ The Power Company is a large public power utility serving Central and South Louisiana for the most part. Among its property holdings are the usual generators, sub-stations, lines, poles, and so forth, which make up a large integrated power complex. In the City of Thibodaux proper the only tangible equipment of Power Company is its ultimate distribution system made up principally of lights, poles, and wiring. The condemnation involved in this action is, as previously mentioned, limited to the corporate limits of the City. However, outside of the corporate limits are the generators and sub-stations of Power Company which supply the power to the lines and poles within the corporate limits. These extra-urban facilities of the Power Company are extensive in size and diversification of location, and are, in fact, what give the intra-urban facilities their value. In addition to its intra-urban property subject to seizure, the Power Company has a franchise to operate within the City which, when suit was filed, had 64 years to run. This the Power Company will lose by the expropriation. Moreover, the loss of the franchise necessitates the building of distribution facilities around the City in order to continue service to other areas of the State of Louisiana. Similarly the expropriation will render useless, in some degree, the extra-urban facilities of the Power Company which had formerly supplied the power to the intra-urban facilities. Lastly, Power Company loses the right to operate in and derive profits from the customers within the City. As a consequence, the City is taking from the Power Company, and for which it must pay, four items:

a) The physical properties within the City.

b) A franchise.

c) The usefulness of certain extra-urban properties.

d) The right of passage through the City to serve other areas.

It was the valuation of these items which prompted the reference to the Commission and which brings this case, now, to its ultimate resolution at the trial court level.

■ In its initial charge to the Commission, the Court, in addition to general orders, set out the items to be valued by the Commission as follows:

a) Market values of the physical properties to be expropriated.

b) Market value of the Company's franchise rights in the territory affected.

c) Severance damages, if any.

d) Consequential damages, if any.

The general rule to be applied was the valuation as between a willing buyer and a willing seller, with certain important limitations. The facilities were presumed to be useful to the hypothetical buyer in their present location without substantial alteration. Even though the City could operate without a franchise, it was presumed that it would need the same franchise enjoyed by the Power Company. The franchise value might be judged by comparable sales and evidence of actual earnings. Guesses about future profits were to be disregarded. The severance damages were to be considered by evaluating the total system prior to the expropriation and subsequent to it with the resultant figure being severance damages. The cost of relocating around the City was to represent the consequential damages. Both parties objected to this charge and after a hearing and submission of briefs the Court altered the

charge in certain material aspects. In the Amended Charge to the Commission the market value was to be determined as at the time the proceedings reopened in this Court subsequent to the abstention. Evidence of future growth, "when proved to a reasonable certainty", could be considered in assessing value to the franchise. As to the consequential damages, the Commission was ordered to consider the benefit to the Company due to opening new areas of profit due to the new facilities in evaluating the cost of circumventing the City with the new lines and poles. With this Amended Charge before it, the Commission proceeded to take testimony and draft its first report.

On August 21, 1961, the Commission filed its first report. The Report itself demonstrates the extreme difficulty involved in the instant evaluation under the general jurisprudential rules of condemnation. The very nature of this expropriation, whose uniqueness counseled federal abstention in the first instance, precluded the use of similar sales in the area as a guiding factor as is usual in expropriation of real estate. The right of eminent domain is not exercised against small portions of large integrated power systems with sufficient regularity to permit the use of well-known tests of valuation. More to the point, the Commission found no evidence of comparable sales in the area. Consequently, a piecemeal approach, which nonetheless had support in the jurisprudence, was adopted. The problem, while somewhat simple in statement, defies simple solution. What would a willing buyer pay for the physical facilities within the City in addition to the right to exercise the 64-year, nonexclusive franchise to operate that went along with the property, presuming there was a willing seller? The Commission answered the question as follows:

The Commission first found that the value of the system itself could be evaluated fairly only by taking the physical property and the franchise together. This was based on the premise that the conglomeration of poles, wires, and conductors was worth little unless viewed as an income-producing unit. Likewise, the franchise was worth little unless viewed as a legal right to produce income. Hence, the two items were viewed together through the medium of capitalizing income. In short it was the Commission's intent to determine what amount of money invested at a predetermined rate of return would produce the amount of net income attributable to the operation of the seized property under the rights of the franchise.

The Commission began with the gross revenue of the Power Company from its city operations over an annualized twelve-month period. Since the expropriated lights and poles represented only a minute portion of the total income-producing unit, namely the total integrated power company, the expenses attributable to the property within the City had to be derived from property outside the City which was not in fact being seized. As an indication of the importance of the Thibodaux business to the total structure of the Power Company, the Commission took the ratio of the peak kilowatt load in the City of Thibodaux to the peak load of the total Power Company system. The resulting figure, i. e. 0.0025, represented the degree to which the City benefitted from the expense of the whole system. This percentage was then taken of the total transmission, distribution, general administrative, and depreciation expense of the whole system and the resulting figures deducted from the gross income. That figure was adjusted for taxes and then capitalized at 5.92% representing the Commission's ratio of total net income to total net investment. The capitalization figure was $482,686.00. This was the composite value to a willing buyer of the property taken and the franchise to operate that property.

In order to achieve separate values for property and franchise, the Commission adopted the City's expert valuation of the physical property by adopting the Power Company's inventory on a cost of

reproduction new, less accrued depreciation, or $165,654.00. This subtracted from the capitalized figure was $315,-031.00. Since the only other thing of value being taken was the franchise, the Commission concluded that this must be the value of the franchise.

At this point the Commission had evaluated the property expropriated at a given date, but without considering the prospect that the net income capitalized might increase in the future due to future growth of the area under condemnation. This Court in both the original and amended charge to the Commission had cautioned that future growth had value and was to be considered but only to the extent of its reasonable evaluation. The Commission rejected the Power Company's proffered evidence on future growth with the finding that, while there was real evidence of future growth, there was no reasonable certainty of its present value and consequently rejected any specific evaluation of it.[10a]

As to severance damages the parties took, as they have throughout this proceedings, widely divergent views of valuation. Severance damages may briefly be described as the loss to the value of the remainder of the system due to its future inability to use the expropriated property. For example, a generator which supplied power to a distribution system is rendered somewhat useless if the distribution system is expropriated even though the expropriation does not touch the generator. Its ability to produce income is impaired. Of course, the valuation of the loss is adjusted according to the ability to convert the unused generator to other income-producing uses. The City said that since so small a portion of the total system was being taken, there were in fact no severance damages at all. The Power Company hypothecated that the total system would be rendered progressively useless and projected what would have to be invested to continue income production. Once the rate was established it was applied to the Thibodaux expropriation for that limited valuation. The Commission rejected both as unrealistic and viewed the surrounding property which directly contributed to the Thibodaux property as being directly affected by the expropriation. It found that Thibodaux's total power use for the affected area represented 7.9% of the depreciated value of the substation as severance damages, or $17,380.00.

As to consequential damages, the Commission strictly followed the Court's amended charge. The Commission took the estimated cost of two by-pass lines and valued the consequential damages at $99,575.00. It refused the added cost of maintenance of the new lines as consequential damage on the grounds that the Power Company would be adequately compensated by the new business opened up by the new lines.

The total valuation was $599,640.00. Both parties objected to every finding.

The City objected to the valuation of the franchise on the grounds that it did not represent the market value of the franchise. More specifically, the City objected that the Commission's methods of valuation by capitalization of income was incorrectly used. This was due, according to the City, to the use of the income figure of $121,000.00 as gross income. The City urged that the Commission should have applied its 0.-0025% figure to the total income of Power Company in order to determine the income directly attributable to the condemned property. The City also complained that the consequential damages were not proved to any reasonable certainty.

The Power Company objected that in arriving at the net income figure, the Commission had duplicated expense figures through a misapprehension of the Seal Report analysis of Distribution Expenses and General & Administration Expenses. It also urged that in valuing the severance damages to the affected sub-station, the Commission

10a. See Report of the Commision, P. 18.

should have used the ratio of the City's *use* of electricity to the *capacity* of the sub-station rather than the City's use to the present output of the sub-station. Its principal objection was to the Commission's disallowance of future growth as a determining factor in valuing the franchise. The Power Company observed that there was objective evidence in the record in the Seal Report which reflected the expected increase of income projected to the anticipated date of customer saturation. The Power Company adopted the Commission's reasoning and stated that if capitalized income was the determining factor then it was possible to capitalize the expected future income from future growth and reduce it to present value.

After briefs and argument, this Court referred the matter back to the Commission on special interrogatories. The nature of the interrogatories indicates the Court's concern with the value of the franchise as fixed by the Commission. The Court inquired of the Commission what consideration it had given to the factors of non-exclusiveness of the franchise and the fact that it would only last 64 years. The Court also asked what consideration had been given to the fact that uncondemned property contributed to the income used as a base figure for capitalization of net income. It is evident that the City's objections prompted the referral to the Commission since each of these factors might, under some construction of the facts, materially affect the value of the franchise, certainly in a downward rather than in an upward manner.

In its Supplemental Report filed February 28, 1962, the Commission indicated that the lack of effective competition to the operator of the condemned facilities greatly reduced, if not eliminated, the impact of the non-exclusive quality of the franchise.[11] As to the fact that the franchise was to run for 64 years, the Commission calculated that the value of the franchise over 64 years and 9 months was substantially the same as the total value of the condemned distribution system measured by capitalized net income based on a net annual return for the twelve months ending April, 1961. Moreover, the Commission concluded that the franchise period was so long that it *was virtually immaterial in reducing or effecting the value of the* franchise.[12] As to the consideration of extra-urban facilities in determining the gross income attributable to the intraurban facilities, the Commission stated that it had considered the costs of such extra-urban facilities at every stage of its calculations and, in any event, calculating the gross income on the ratio of City customers to total customers resulted in a greater net income.[13] Moreover the use of 0.0025 against the company-wide income resulted in the figure being almost identical with the figure used by the company as net income. Lastly it noted that a reduction of .0025% of the Power Company's peak demand and a .0034% of its total customers did not justify any greater severance damages than those allowed.[14]

Thus the Commission reconfirmed its original findings. Again the parties objected. After a hearing, this Court, as

11. "Thus, within the limitations of the Court's amended charge, the competitive factors limiting the City of Thibodaux from acquiring the business and the statutory protection afforded Louisiana Power & Light Company in its business area, the Commission concluded that the non-exclusive nature of the franchise should have little effect on its value." Supplemental Report of the Commission, P. 4.

12. "The Commission was and is of the opinion that the only evidence in the record

tends to support the fact that the period of 64 years and 9 months is long enough to support a value for the franchise that is not diminished by the fact that some of its period had run." Supplemental Report of the Commission, P. 6.

13. See Supplemental Report of the Commission, PP. 6–7.

14. Supplemental Report of the Commission, p. 8.

then constituted overruled the objections of the City and the Power Company with a general commentary that the franchise value seemed inordinately high and that it seemed that the Power Company had fared too well. However, since the Court felt it could not say with assurance that an injustice had been done after viewing the record as a whole, it accepted the Commission's valuation. Thereafter the Court held a hearing on Commissioners' fees and subsequently set them. The Power Company moved to fix the costs it had incurred.

After the Court, as presently constituted, ascended the bench both parties moved for a new trial and the defendant for the assessment of costs, among them being a bill for $30,000.00 experts' fees. Except for fees and costs these matters were heard and submitted, the Power Company introducing additional evidence on the value of future growth based upon actual experience.

The positions of the parties, now thrice urged, argued and briefed, have a familiar ring. The City says that the franchise right on a non-exclusive basis, with only 64 years to run, to serve not quite 900 people with electricity, could never be worth so much as the Commission says. The City also says that severance damages are either not compensable at all, or are not reasonably certain of assessment. The Power Company now directs its attack principally against the Commission's failure to award anything for the value of future growth. Essentially, the parties disagree on the philosophy of valuation of this peculiar sort of property being expropriated.

Confronted now with the inevitable necessity of decision, the Court must first observe that the parties have had their day in court, and then some. The Court has read and re-read the briefs and cited authorities of counsel for both parties. It has, as indicated, given great weight to the fact that the present posture of this case, legal and factual, is the result of numerous conferences, innumerable briefs and extended argument. At this stage, any Court is most reluctant to re-evaluate the conclusions based on so much that has given before. Thus, with a caution born of appreciation for the legal eminence of the counsel in this case, this Court briefly sets out the legal considerations which it understands to have occupied Court and counsel over the years of this litigation.

As to the position of the City that the Commission has given value to business profits or opportunity, contrary to the law of Louisiana, two things may be said. The cases cited by the City's counsel deal primarily with the condemnation of realty.[15] Briefly stated, the law of Louisiana says that you may not look to the future to judge the value of the property taken. The Court understands the law to be that when valuing a piece of land, one may not divine whether it may someday have an ice cream parlor or a federal reserve bank on it.[16] Similarly when the State, under its sovereign power seized property with a hardware store upon it, one may not presume that the state is going into the hardware business and thus evaluate the business itself and future earnings from that business. Where only land is involved it is simple to examine comparable sales of surrounding property to determine value since land has value depending on its location rather than the skill and ingenuity of its owner under condemnation.[17] Hence an acre of land on Canal

15. See generally State v. Sauls, 234 La. 241, 99 So.2d 97; State Through Department of Highways v. Central Realty Investment Co., 238 La. 965, 117 So.2d 261; State Through Department of Highways v. Hub Realty Co., 239 La. 154, 118 So.2d 364.

16. See In Matter of Morgan R. & S.S. Co., 32 La.Ann. 371, 376, approved State v. Levy, 136 So.2d 35.

17. See the language of the trial judge approved and affirmed in State Through Department of Highways v. Hub Realty

Street in New Orleans is worth more than an acre of land in the salt marshes even though owned by the same person.

However, the instant situation presents a different case. The City is seizing this property to use it in the same manner and for the same purpose as its present use. The City is in fact seizing a going business to continue it as a going business. Moreover, there are no similar sales in the area by which to test the sales price.[18] The City is not buying the poles, lines and equipment to clear them away and build a school. The City wants the Power Company's distribution system and its customers. It is in this light that the "willing buyer-willing seller" concept must be viewed

and rationalized to fit the novel circumstances of this case. Undoubtedly this was the view of the District Court which issued the two charges to the Commission. But the problem is how to value a conglomeration of poles and wires and transformers and franchise which make up a going business when it is the business that the buyer wants?

■ The law of Louisiana says that when the State builds a road and must destroy a gasoline station to do it the state need not pay for a gasoline station because the land and a building is what it wants and what it gets, not a gasoline station business.[19] This Court has had to make an "Erie calculation" of the law of Louisiana.[20] The judgment of this

---

Co., 239 La. 154, 118 So.2d 364. See also In Matter of Morgan R. & S.S. Co., supra, and State Through Department of Highways v. Lewis, La.App., 142 So.2d 652. To this must be added the caveat of the Louisiana Supreme Court in State v. Sauls, 234 La. 241, 99 So.2d 97, 102:
"We have also stated * * * that rental income derived by the owner, and value of business conducted upon expropriated premises, while not the sole measure of compensation, may be considered along with other factors in arriving at the market value * * *." Citing many cases.
It appears that while the State need not pay for the business taken when involved with a seizure of realty, nevertheless the value of the business may be taken into account in determining the market value.

18. The absence of comparable sales in the area gives rise to the approach taken in this case in accordance with the express law of Louisiana:
"If evidence of similar sales is not available, the value of the land expropriated must be determined by other means, generally the testimony of experts." State Through Department of Highways v. Hub Realty Co., supra 118 So.2d at 368.
The Court takes judicial notice of the fact that in March of 1963, the City of Lafayette, Louisiana, expropriated the facilities of the Gulf States Utilities Co. within the limits of that City for $740,-173.00. The taking involved the taking of the customers as well as the physical facilities. The number of customers involved was 460. To this must be com-

pared the fact that the City in the instant suit in taking 828 customers as of the cut-off date of April 1, 1961, at a total value here determined to be $1,379,-558.00. The arm's length transaction in the City of Lafayette case indicates, at least, that the present value put on the Power Company's customers is not as exaggerated as the City would suggest. The City of Lafayette has paid $1,609.07 per customer while the City in this case is asked to pay $1,667.34 per customer.

19. See State through Department of Highways v. Lewis, La.App., 142 So.2d 652. It is significant to note that in the Lewis case, the Court rejected the "income production method" of valuation because there were preferable methods of valuation available, namely comparable sales in the area. It should be observed once again that the absence of comparable sales in the area counseled the method used in this case. See Footnote 18 supra.

20. That this diversity case is ruled by the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, is not to be questioned particularly since the Supreme Court's decision in this very case, see 360 U.S. 25, 40, 79 S.Ct. 1070, 3 L.Ed.2d 1058, dissenting opinion of Justice Brennan. More to the point, it was the opinion of the dissenting Justices in this case that the District Court should have made its projection of Louisiana law without the aid of the Louisiana courts on the question of the applicability of the Louisiana condemnation statute here in issue * * * On the question of the proper method of valuation in this case the lure of abstention is present but unavailable since the difficulty of deciding

court, throughout this litigation, has consistently been that when it is the business itself which is being seized, it must be valued in the only way businesses can be valued, i. e. according to its ability to produce income. To this must be added the compelling fact that the statute under which this expropriation is made states that the municipality must pay the "value of the property plus all damages sustained in consequence of the expropriation." La.R.S. 19:101, LSA. The City's citation of numerous authorities to the effect that consequential damages are not allowed under Louisiana law founders on the specific language of the statute.

The Power Company, on the other hand, says that, accepting the law as stated and the Commission's method of valuation, whole value has not been given. The Power Company says that in valuing a business one does not look solely to the past record of income production but rather one must look to the reasonable expectation of improving income production by future growth. The impact of this reasoning can be understood by viewing the record.

■ In its original charge to the Commission, the District Court treated the subject of future growth as follows:

> "In determining the market value of this privilege (franchise) the commission will be guided by comparable sales in the recent past, if any. Otherwise, evidence of actual earnings from the affected area may be considered, together with expert testimony. Evaluations of future growth and guesses about anticipated future earnings, being too speculative, must be excluded."

The Power Company objected to this charge and in the Amended Charge, the above language was altered by this Court in the following particular:

> "Future growth, when proved to a reasonable certainty, may also be

considered, but mere guesses about anticipated future earnings, being too speculative, must be excluded."

This demonstrates that the District Court precisely understood the Power Company's position and accepted it, with the caveat that the value of the future growth had to be ascertainable to a reasonable certainty. This Court finds itself in agreement with this particular charge as being perfectly consistent with the tenor of the charge taken as a whole relying, as it does, on income production as the principal means of valuing the condemned property.

It is important to note how the Commission treated this charge in its findings. In denying any value for future growth, the Commission made the following statement at p. 18 of its first report:

> "*FUTURE GROWTH*. Mr. Seal in his report has included a computation of future growth (see Seal Report, pp. 12–13) in the portion of the City of Thibodaux wherein is located the physical property subject to this expropriation. (See also the Transcript pp. 112–116). He has placed a value of $1,041,516.00 on the increase in the worth of the business to arrive at a total value of $1,863,582.00 for the physical property and franchise in the area subject to this expropriation. This is the value assigned to the property and franchise with the company serving the area at a saturation point of 1200 customers and as annual kilowatt hour sales in the area of 10,320,000. Seal Report, p. 13. In view of the fact that this value is a value at some time in the future, it is clearly not the value today. Mr. Helfman offered no evidence either in exhibits or testimony with regard to future growth.

> "The Commission recognizes that this growth would have some value but the record does not reveal evi-

the state law question is no justification for abstention. Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25,

39, 79 S.Ct. 1070, 3 L.Ed.2d 1058; Meredith v. City of Winter Haven, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9.

dence of its value as of the present time. Additionally, the defendant in argument refers to the value of the property and franchise in the City of Thibodaux based on future earnings 'shown to a reasonable certainty' as $1,863,582.00 and urges consideration thereof but does not pray for an award for future growth. Therefore, the Commission makes no award for future growth."

In its second and supplemental report, the Commission made the following statement touching the matter of future growth:

"It should be kept in mind that this latter figure [value assigned by Commission to franchise] does not include any allowance for future growth under the franchise. Certainly the Commission was and is satisfied that its value of $317,031.00 ($317,032.00) assigned to the franchise in the Report is conservative."

This Court, in its reasons for judgment overruling the objections to the Commission Reports stated with regard to future growth:

"As to the denial of the defendant's claim for future growth, the commission's findings are clearly supported by the evidence, or, more precisely, the lack of evidence."

This Court finds the Commission's reasoning (or the lack of it) in denying future growth unconvincing. The Commission was charged by this Court to evaluate future growth if it could be done to a reasonable certainty and consequently, it is wholly immaterial whether the Power Company prayed for it or not. Conceding it had some value, on the grounds that there was no evidence of present value appears inconsistent with the "modus operandi" of the Commission itself. In capitalizing income based on prior earnings, the Commission made a necessary finding that the past income would continue into the future. Note in particular the calculations on Page 5 of the Supplemental Report of the Commission.

If all that is lacking in the Commission's determinations is the present worth of future growth, then the Commission's finding is patently erroneous. Since the Commission finds that future growth has some value and there is evidence in the record to support that value then there is no difference between projecting past earnings into the future and reducing to present worth and projecting reasonably certain future growth into the future and reducing it to present worth. The crucial issue would be whether there was any basis for making a projection of future growth. This question is factually established by the Commission's finding that future growth had some value. But there is more.

The Power Company's evidence of future growth was in the form of expert testimony based on a report of projected estimates of customer increase up to a point of saturation in the area affected by this expropriation. This report of projected saturation was prepared by the City's experts.[21] Hence the City had endeavored to determine when the affected area would have the maximum number of customers using the maximum number of kilowatt hours. The Power Company's experts then projected the increase in net income eventually to be derived from such situation and indicated that this was "future growth". Based as it is on the City's estimates, the Power Company's expert's opinion is entitled to substantial weight. The fact that the City's report reflects that there will be more customers in the future to use more electricity is certainly confirmation of the Commission's findings that future growth had substantial value.

Owing to the time lag between the valuation date in the Commission's report and the date of the hearing of the instant petitions, Power Company now goes forward in an attempt to prove that time has confirmed the estimates of future growth, or in fact has shown them to be

21. See Barnard & Burk Report.

too conservative. In the Power Company's exhibit Seal R–7 and Mr. Seal's oral testimony are found the fact that the area under condemnation has acquired 42 new customers since the original cut-off date of April 30, 1961, by September 30, 1962, and has increased revenue from the base period of $115,936.00 to $140,524.00 at September 30, 1962. These figures are taken from the company's books. Mr. Seal testified that the increase of revenue and kilowatt hours was due to the increase of electricity used by the former customers and the additional customers since the cut-off date. Of this evidence two things may be said.

■ First of all these figures are admissable, to the extent mentioned above, to prove nothing more than a validation of the calculation as to future growth in the condemned area[22]. Secondly, while it may be argued that business loss is not compensable under Louisiana law, and to that extent might not be cognizable by this Court in fixing an award, there is no doubt in the Court's mind that, under the circumstances of a condemnation of an electrical utility as an electrical utility to be operated as such, these facts of future growth must be taken into consideration in fixing the present value of the whole system to a willing buyer.

The final problem is how to give effect to the value of future growth. On the one hand is the argument of City's counsel that the adoption of Seal R–7 amounts to awarding the Power Company the full value that might ever accrue to Power Company by paying for all the future profits. This, says city's counsel, is unwarranted from the willing buyer-willing seller viewpoint. On the other hand, denial of any value to future growth is equally in contravention of Louisiana Law, as this court reads it. The solution lies somewhere in the middle of a legal problem that is "res nova" in its application so far as this court can conclude from the statute and jurisprudence of Louisiana.

■ Since, as has been mentioned repeatedly, future growth, by the law of this case, has value only if provable to a reasonable certainty, it is necessary to look to the evidence in the record. By that same token, since the Court gives great weight to the prior history of this case, it is necessary to follow the "modus operandi" of the Commission so much as is possible. With those two considerations in mind, the Court concludes that future growth can best be evaluated by using the Commission capitalization method for determining present value and its interest rate on the one hand and the evidence of incremental Net Income attributable to future growth demonstrated by the initial Seal Report on the other in order to value future growth within the four corners of the Court's charge to the Commission and the evidence adduced at the hearings.

■ The Court has gone to great pains to indicate the wisdom and legality of the Commission-approach to valuation. The Court must similarly point out that the only evidence of Net Income affected by future growth was introduced in the initial Seal Report[23] and stands uncontradicted. Previously it was observed that the Commission's rejection of such evidence as lacking present value is unsound. The Seal Report figure for increase in Net Income due to future growth is $47,389.00. It is necessary only to capitalize this at the Commission's rate of 5.92% and reduce it to present value on the basis of the 64 years left to run in the franchise. This, the Court concludes, properly reflects the legal application of the Commission formula as defined by this Court's charge to the evidence in the record. The resulting figure is $781,918.00.

It remains only to add this figure to the determinations already made by the Commission to arrive at the ultimate award. Close analysis of the valuation given severance and consequential damages convinces this court that these, like

---

22. See Seal Report, P. 6.

23. Seal R–6 Green Book P. 13.

the Commission approach to present value, must be confirmed and adopted as the findings of this Court. The net award becomes:

### MARKET VALUE OF EXPROPRIATED PROPERTY

| | | |
|---|---:|---:|
| Physical property | | $ 165,654.00 |
| Franchise ... | | |
| Value of present income | $315,031.00 | |
| Value of future growth | 781,918.00 | 1,096,949.00 |
| | | |
| Severance damages | | 17,380.00 |
| Consequential damages | | 99,575.00 |
| | | |
| Total Award | | $1,379,558.00 |

———◆———

This Court observes that while the point at issue may be novel to Louisiana jurisprudence, it has been faced elsewhere and awards for future growth, particularly where a public utility is concerned, countenanced. See Kennebec Water District v. City of Waterville, 97 Me. 185, 54 A. 6, 60 L.R.A. 856, East Boothbay Water District v. Inhabitants of Town, 158 Me. 32, 177 A.2d 659, Onondaga County Water Authority v. New York Water Service Corp., 285 App.Div. 655, 139 N.Y.S. 2d 755. While this case is exclusively a question of Louisiana law, it is a question upon which Louisiana courts have not spoken definitively and this Court feels constrained to note how other courts have treated the question when faced with it. While not binding upon this Court, those decisions confirm this Court's conclusions as to the valuations of future growth.

The figures used in the final computation satisfy the Court that every element of value set out in the Court's Supplemental Charge has been computed and satisfied. The composite figure represents to the Court a reasonable basis for a judgment of market value under Louisiana law under circumstances in which comparable sales in the area are not available and expert testimony and capitalization of earnings are the alternative methods provided by Louisiana law.

Lastly, this Court draws attention to the sale of the Lafayette Power facility to the City of Lafayette, Louisiana. Initially this Court points out, as before, that this is not in fact a comparable sale, evidence of which is before the Court. However, having taken judicial notice of such sale, the Court hastens to point out that this arm's length sale resulted in a cost of $1,609.07 per customer in the condemned Lafayette area. The resulting cost in the Thibodaux area under this Court's award is $1,667.34 per customer. At the every least this demonstrates that the award in this case is far from inordinate. Quite to the contrary, it impresses this Court as being in full conformity with the law. The law on this subject is not free from every cloud of doubt but in this Court's judgment the award does justice between the parties on the basis of the Louisiana law and amounts to a reasonable compensation for an electrical utility which the City of Thibodaux is seizing to operate as its own.

In recapitulation, this Court does adopt the Commission's formula and findings as to present income projected by the capitalization method as well as its findings as to consequential and severance damages. The Commission interest rate of 5.92% in its capitalization formula is used to compute present value and future growth, thus rejecting the interest rate more favorable to the Power Company, namely 4.55% used by the Power Company expert Seal. Thus it is that the only change effected by the Court covers a valuation for future growth which is

found to be supported by the record and in keeping with Louisiana law.

This Court will then enter a judgment in the amount of $1,379,558.00 to the defendant, Louisiana Power & Light Company, and set down for immediate hearing the question of the expenses for expert's fees expended by the Power Company.

Judgment accordingly.