TUCKER, Judge.
This is an expropriation suit arising out of the taking of several parcels of land, on April 5, 1966, for the purpose of extending U.S. Highway 190 east through the town of Slidell, to connect with Interstate Highway 10. Upon the filing of this suit the *723 Department of Highways deposited one Hundred Thirty-Five Thousand, Four Hundred Twenty-five and No/100 ($135,425.00) Dollars in the registry of court as compensation for the taking of the land and buildings expropriated and for severance damage to the remaining property not taken. The deposit was withdrawn by the defendants. By the time of the trial, January 3-5, 1972, stipulations between counsel had been entered into regarding two of the parcels of land upon which suit was originally brought and only two parcels remained at issue, Parcel 1-3 and Parcel 1-4. Judgment was rendered by the trial court on February 4, 1972, in the sum of $172,969.85 for the property rights expropriated and in the sum of $10,117.10 for severance damages, or a total of $183,086.95, subject to a credit for the $135,425.00 already deposited and withdrawn by defendants, and for interest at the rate of five (5%) per cent per annum from April 5, 1966, until paid on the excess of $47,661.95. On the same date additional reasons for judgment were given by the trial court clarifying its judgment and showing the land value of Parcel 1-4 to be $15,010.10, and damages to the north remainder of Parcel 1-4 to be $2,321.75, and severance damages to the south remainder to be $2,715.35, which amounts were included in the judgment given.
The Department of Highways appealed this judgment, seeking a reduction of the award, while the defendants answered the appeal seeking an increase in the award to $237,880.00.
Prior to the taking Parcel 1-3 was a large triangular tract situated on the east side of U.S. Highway 11, across from the junction with U.S. Highway 190. This parcel had approximately one hundred ninety (190') feet frontage on Highway 190 and contained 4,920 square feet. On the front portion of this parcel of about 100' x 100' there was located a “country style” service station owned by the defendants and under written lease to the Texaco Company at a rental of one cent per gallon of gasoline sold at the station. Texaco in turn leased the station back to defendant A. B. Crow for $1.00 per year. Defendant Crow leased the property on a month-to-month basis to an independent operator, J. T. Callahan, at a rental of l1/^ per gallon of gasoline pumped. Defendant also had a bulk station handling Texaco products for which he rebated Texaco per gallon of gasoline on the service station in question. At no time did he have anything to do with the operation of the station. In his position as lessor defendant realized over $6,000.00 gross per year in rent, which developed a net annual rent of about $4,800.-00. The rear portion of Parcel 1-3 was used for an open trailer court, which contained 10 concrete slabs. The average rental for these slabs per year was $1,631.-66. Most of the service station proper was taken in the expropriation consisting of the improvements and only 4920 square feet of the land, leaving a remainder land area of approximately 1.164 acres with access to U.S. Highway 11 and the easterly continuation of U.S. Highway 190 (Gause Road), which, by the time of the trial had been completed and connects with Interstate Highway 10, east of the present station. By the time of the trial a modern $35,000.00 Texaco station, placed diagonally to take advantage of the present frontage on both U.S. 11 and 190, had been constructed on this remnant of defendants’ property with a substantial remainder behind the building including eight concrete slabs. This whole tract originally contained 1.3 acres, and the taking reduced the land area by a mere .136 of an acre. The frontage on U.S. 11 was reduced from about 195 feet to 77.19 feet, but another frontage was projected and eventually created on the extension of U.S. 190.
Parcel 1-4 was a parallelogram-shaped tract approximately 151 feet on its northern and southern borders and 268 feet on its northeastern and southwestern borders, with three separate buildings upon it used as the FountainbleaU Motel. Parcel 1-4 was the center of the larger “L” shaped *724 tract approximately 151 feet by 600 feet, which center the Highway Department expropriated complete with all improvements. Later it sold the motel back to the defendants. The northern remainder, located on the north side of Gause Road, is a triangular piece containing 23,217.5 square feet, or .553 of an acre. The southern remainder is irregular in shape with the westernmost part coming to an acute angle. It fronts on U.S. Highway 11, with access to U.S. Highway 190 (Gause Road) proceeding toward Interstate Highway 10, and it contains 54,317 square feet or about 1>4 acres. At the time of the trial a 26 unit motel had been constructed upon it, maintaining the name Fountainbleau Motel, and fronting on U.S. Highway 11. With the completion of new U.S. 190, this tract became a corner lot for all practical purposes with access to both of the highways (U.S. 11 and 190).
The Department of Highways alleged the following specific errors in its appeal:
1. The trial court erred in accepting the value of the land and improvements from which Parcel 1-3 was taken, testified to by Mr. Omer F. Keubel, based on his income approach, which included income attributable to profit and the Defendant’s distributorship, and in accepting the testimony of Mr. Keubel as to the land value of Parcel 1-3 of $3.25 per square foot, despite the fact that Mr. Keubel used no comparable sales nor any proven fact to substantiate his opinion.
2. The trial court erred in accepting Mr. Keubel’s assessment of severance damage of $1.00 per square foot to the remainder of Parcel 1-3, inasmuch as his opinion was not based on any comparable sales nor proven fact.
3. The Court erred in accepting Mr. Keubel’s opinion that the North remainder, created by the taking of Parcel 1-4, sustained 10^ per square foot severance damage and in accepting Mr. Keubel’s opinion that the South remainder, created by the taking of Parcel 1-4, sustained 50 per square foot severance damage.
4.The Court erred in fixing the fees of the expert witnesses Mr. Omer F. Keu-bel and Mr. Edwin H. Randle, based on an agreement between them and the Defendants and their counsel, rather than determining the appropriate fees based on the amount of work done by these expert witnesses in connection with this appraisal project.
In determining the value of the lands and improvements taken, the trial court accepted the appraisals reached by Mr. Kue-bel on the income approach method. This appraiser with respect to Parcel 1-3 concluded that the highest and best use of an arbitrary area in the extreme southwest corner of the said tract, comprising 100 feet by 100 feet, was for a service station. He chose to consider that the sales of other property in the vicinity of subject property furnished him by his co-expert, Edward H. Randle, were not true compara-bles and discarded them insofar as pinpointing the value of this portion of Parcel 1-3. This witness also rejected the cost approach in figuring the value of the “country style” service station, because when the buildings are old and beyond mid-line or in the declining state, the cost approach becomes conjectural, because one has to estimate what the value of the improvements is, then estimate the decline in use, and what portion of the reduction in value is due to depreciation and functional obsolescence. Mr. Kuebel, discarded the replacement new cost less depreciation and obsolescence of the improvements, and resorted to what he considered a better method by using the concept of the capabilities of producing income. This expert, so he states, had difficulty in applying his own preferred method. He initially thought that the small portion, comprising 10,000 square feet, which he chose to separate from the whole tract containing originally 1.3 acres, would produce a net income of $300.00 per month to any buyer who would purchase the property After hearing Mr. *725 Crow testify on this score during the trial, Mr. Kuebel revised this net rental monthly income upward to $400.00, and using an unexplained capitalization rate of 12%, he concluded the abbreviated site was worth $40,000.00 at the time of taking, pro-rating $32,500.00 of this total to less than % of an acre of land, and $7,500.00 to the buildings and improvements. The 4,920 square feet of the selected tract actually taken was assigned a value of $15,990.00, and severance damages of $1.00 per square foot were allotted to the remaining 5,080 square feet of this tract with no supporting or substantive reason or explanation given. This amounts to a per acre evaluation of the land alone of $141,570.00. The remaining portion of the tract comprising 1.164 acres was stated by Mr. Kuebel to be separate in character, and without any unity of use with his small selected portion. He did refrain, therefore, from assigning any severance damages to this remainder.
We now consider the propriety and justification of the defendant’s experts in making their appraisals on the basis of the income approach and in rejecting the market data approach as not being truly representative of value. The trial court accepted Mr. Kuebel’s testimony that the sales, asserted to be comparable in character by the plaintiff experts, actually bore no similarity to any of the property taken here.
In this regard we are confronted with the universal legal precept that the measure of compensation to be awarded in expropriation proceedings is the fair market value of the property, and that the most important method or criterion in determining such market value are sales of similar or comparable properties in the vicinity. See State, Through Department of Highways v. Tolmas, 238 La. 1, 113 So.2d 288 (1959); State, Through Department of Highways v. Barber, 238 La. 587, 115 So.2d 864 (1959); and State, Through Department of Highways v. Babineaux, 189 So.2d 450 (La.App.3d Cir. 1966). Of course, where there are no comparable sales to render effective the market data approach, ascertainment of value may be accomplished by the use of other methods and the consideration of other factors and circumstances. In a proper case this would permit the income approach in determining value, provided the testimony of the experts, approaching the problem from this standpoint, is well reasoned and substantively based. See Tolmas, supra; State, Through Department of Highways v. Hub Realty Co., 239 La. 154, 118 So.2d 364 (1960).
We believe the trial court was erroneous in accepting the appraisal opinion of Mr. Kuebel, based upon the rental income, produced by Parcels 1-3 and 1-4. We find that the sales of similar properties cited by plaintiffs appraisers are true com-parables to the subject tracts, which, with the adjustments generally required in such instances, give a reasonable basis for estimating the amount an informed purchaser would be willing to pay and an informed seller would be willing to accept for the subject tracts. Where the prime means for determining value is present, resort to a secondary method of fixing value is unwarranted.
The direct effect of the subject highway extension left ample land for Mr. Crow to construct a new, modern service station, placed diagonally at the intersection, which he stated cost him $35,000.00 to erect. This new facility has frontage presently on both main routes, whereas, previously the old “country style” station had frontage only on U.S. 11. The access to U.S. 11 is termed by defendant as extremely restricted as its pre-taking frontage on this route of approximately 195 feet has been reduced to 77.19 feet. The actual taking by the State at this point of defendant’s 4920 square feet was necessary in order to provide the structural standards (widening of the road area) at this proposed important intersection. While we do not intend to say that these facts bear directly on the before taking value of the *726 4920 square foot piece, the testimony and the photographic evidence clearly depict the defendant’s remaining tract amply accommodates his new service station with sufficient frontage to attract traffic traveling on the two major highways, U.S. 11 and 190, whereas, previously his frontage was confined to U.S. 11.
Under these circumstances we do not believe that the record supports the trial court’s award of severance damages to the remaining 5,080 square feet of the small tract which Mr. Kuebel extracted from the original tract as an example. His testimony on this score that the taking of this piece created an irregularity of shape in the remaining 1.164 acres, which caused him to attribute a $1.00 per square foot severance damage to the 5,080 square foot portion of the remainder, simply will not stand muster. The appraisers for the state adequately supported their opinions that the subject property sustained no severance damages.
The jurisprudence of this state universally holds that the market value of land taken is determined on the date of the taking, and severance damages, described as the difference in the market value sustained by a remainder caused by the taking, are determined as of the date of the trial. Unless the landowner shows by competent evidence that the value of the land remaining after expropriation has been diminished by taking, compensation will be limited to land actually taken. The burden of proving severance damages rests upon the landowner, who must establish such damages with legal certainty by a preponderance of the evidence. See State, Department of Highways v. Levy, 242 La. 259, 136 So.2d 35 (1962).
The state, in taking its position that there are no severance damages to the remainder, does not claim that special benefits accruing to the subject property should be offset against severance damages. While we are in full accord with the expressions and legal conclusions reached in State, Department of Highways v. William T. Burton Industries, Inc., 219 So.2d 837 (La.App. 3d Cir. 1969) in which the court held that special benefits due to the construction of a public facility may be offset against severance damages otherwise allowable to the landowner, and general benefits which accrue to all property in the vicinity or neighborhood due to a general enhancement caused by the public improvement and generally improved economic conditions may not be subtracted, we do not believe that the peculiar facts of the cited case are apposite to the facts here. We have no quarrel with the principle expounded in Burton that, where there are severance damages, an award shall be made and no credit will be allowed in assessing such damages despite a general enhancement which accrues and is common to other property in the same vicinity or neighborhood. Whether the benefits accruing to defendant’s remainder was general or special in nature is not raised here.
Before the taking there was a parcel of land owned by Joseph Oreglia (Orelia), fronting 84.01 feet on U.S. 11 which fully separated the two tracts. In his appraisal opinion of the valuation of the property taken as Parcel 1-4 Mr. Kuebel used the income producing capabilities of the motel improvements located there, but he deviated from this approach to the extent of setting a before taking value for this entire land area of 70(1 per square foot or $69,283.00 for some 98,977 square feet. He alluded to an estimate, prepared by A. D. Smith Construction Company, reflecting the reproduction new cost of the buildings and improvements in the sum of $188,014.-00. This appraiser calculated that a figure of 45% correctly represented depreciation and obsolescence, which showed on this basis a remaining value of the improvements in 1965 of $113,243.00 which made the land and improvements in the entirety before the taking worth $182,526.00. Mr. Kuebel added to the latter figure the replacement *727 cost of the swimming pool, which was not taken and the motel sign, and on the cost approach determined the value of entire Parcel 1-4 to be $192,526.90.
This expert then states that because of Mr. Smith’s previous demise that he cannot give full weight to the deceased’s type of evaluation.
Mr. Kuebel then shifts to the income producing capabilities of the motel, which he opines is the best method to arrive at true value. In this approach his estimated value of the land remains the same 70‡ per square foot on which figure the witness says he is “reasonably assured.” On the basis of 75% occupancy of the 26 motel units on an annual basis, and subtracting operating expenses, he concludes that the motel produced a net annual income of $21,789.05. After subtracting 8% of the land value for the return of the land investment of $5,542.64, he imputed the balance of the net income of $16,246.41 to the improvements. He then used a capitalization rate of 8% for the return of Crow’s investment and another 5% for recapture of his motel cabins, creating a total capitalization rate of 13%. By this method he reached a total value of Parcel 1-4 in the sum of $194,255.36, rounded to $194,000.00. Mr. Kuebel did not ascribe in detail any reason for his adoption of this rate of capitalization.
Mr. Kuebel and Mr. Randle are at loggerheads with reference to the highest and best use of that part of the remainder which abuts the southeast corner of the intersection of U.S. 11 and new U.S. 190. Mr. Randle thought that this area would be best suited for a service station. Evidently, Mr. Kuebel considered this corner piece could be best utilized, as it previously had, for part of the motel site. This appears clear, as otherwise, it would be even more difficult to fathom the determination by Mr. Kuebel that the piece taken in Parcel 1-3, at the northeast corner of the two main highways was worth $3.25 per square foot, and the property at the southeast cor-
ner of the intersection in Parcel 1-4 was worth only 70‡ per square foot before the taking. Of course, we are cognizant of the fact that the service station was already in place on Parcel 1-3, and there was no such facility located on the south tract before the taking. Nonetheless, the huge difference between the per square foot value assigned respectively to the small tract at the northeast corner and the remainder on the south side abutting the same intersection or a difference of $2.55 per square foot seems to partially confirm the fallacy and difficulties which arise in using the income approach and departing from the most important criterion, the market data approach, in fixing value. Again, as with Parcel 1-3, we are unable to discern from the record circumstances which would justify rejection of the market data approach, involving consideration of similar or comparable sales, in determining the before value of the whole tract from which Parcel 1-4 was taken.
At first blush it might appear that the facts with respect to Parcel 1-4 would justify the application of the principle expounded in Burton, supra, that an enhanced value of remainders, resulting from general benefits to properties in the vicinity by the advent of a public facility and generally improved economic conditions, does not preclude the award of severance damages caused by a taking. However, this precept does not apply to the facts of the instant case, as the weight of the evidence clearly shows the remainders increased in value immediately after the taking, and continued to elevate until the time of the trial. As stated in Burton, supra, severance damages sustained by a remainder is the difference in its market value caused by the taking. The mere division of the south remainder into two separate parts caused by the taking of Parcel 1^4, the temporary loss of road frontage of the part north of U.S. 190, the irregularity of the shapes of the remainders created by the road construction, and the reduction of the area for the placement of the motel *728 units were subjects of inconvenience only, and had no adverse effect on the worth of the two pieces in Parcel 1-4. We, therefore, consider that it was error for the trial court to award severance damages of 10^ per square foot for the .553 acre tract north of new U.S. 190 and 5^ per square foot for the approximate 1]4 acres south of the said highway in accordance with the opinion of Mr. Kuebel. The opinion is unsupported with comparables or other material and substantive facts bearing on the question.
Before the taking, Edward J. Deano, plaintiff appraiser, using the market data approach, appraised the 4920 square feet expropriated from the north tract at 550 per square foot or $2706.00 and the improvements, on the basis of reproduction new cost less depreciation and obsolescence, in the sum of $5,540.00 or a total of $8,246.00. After the taking Mr. Deano interpolated an ideal tract for use as a service station of 150 feet by 150 feet or 22,500 square feet to which he ascribed a value of $1.75 per square foot or a total of $39,375.00. The remainder of this parcel, 28,204 square feet, he continued at its pre-taking value of 55^ per square foot in the sum of $15,512.00. The total appraisal attributable to remainder of this parcel equaled the sum of $54,887.20. His opinion was supported by comparable sales of properties, some of which were located in the immediate vicinity, and others at some greater distance from the scene. The testimony of Mr. Crow clearly shows that his available access between the rear portion of the north remainder and new U.S. 190 is 54.44 feet in width, and that he has a driveway of 35 to 40 feet within this area. Much consternation was evinced by counsel due to plaintiff’s appraisers estimating a substantial increase in value of portions of the remainders immediately after the taking. Counsel felt that this procedure involved a projection of a completed new road. That the improvements were not constructed immediately following the taking is a matter of no moment. No special benefits resulting to subject property from the taking are claimed in this instance. As explained in Burton, above, the provisions that severance damages be determined as of the date of trial was statutorily intended to provide that damages suffered by the remainder be reduced by special benefits derived by the remainder upon the completion of the project, and not to deprive the owner of compensation for damage to his remainder because of an increase in value due to generally improved economic conditions occurring subsequent to the taking.
Mr. Deano’s testimony establishes that the taking itself rendered the remainder instantly of more value than before. He so found because the taking placed the remainder on a corner at the junction of two major highways, one of which connected with a nearby interstate route. As Mr. Deano explained, a knowledgeable buyer would readily recognize and appreciate the desirability and value of such a location as a commercial site, particularly service station use.
The defendants are troubled about the lengthy construction period of approximately four years for the completion of the'new road having an adverse effect on a prospective purchaser of the rear portion of .553 acre remainder. This would not bring about a reduction in the market value, as this piece never had any road access other than the frontage of the whole tract on U.S. 11. When the case was tried this remainder had frontage on and access to new U.S. 190. It is true that there were barrier type concrete curbings, 16 to 18 inches in height, but there were gaps, referred to in the record as “stubs”, provided to accommodate the various properties adjoining the new road with sufficient access, including the Crow property. The record does not reflect any limitation of access to the new highway insofar as the remainders located on the south thereof.
As noted previously Mr. .Deano’s estimated value of the land taken as Parcel 1-3, and the improvements, after deprecia *729 tion, was $8,246.00. Henry B. Breeding, the other appraiser for the state, estimated the land value of Parcel 1-3 at 55$S per square foot or $2706.00, and the depreciated value of the improvement in the amount of $5704.00 or a total value of $8,410.00.
Both appraisers Deano and Breeding found that the highest and best use for 45,144 square feet, being the southwest portion of the remainder after the taking of Parcel 1-4, was for the purpose of a service station. Mr. Deano figured the worth of the entire property before the taking as it was being used for a motel site, comprising 90,750 square feet, at 60‡ per square foot or $54,450.00, and he estimated the depreciated value of the buildings and improvements taken in the sum of $98,604.00. This made a grand total value of Crow’s south property before taking of $153,054.00. Mr. Deano estimated the value of the 21,443 square feet taken from the south tract at 60‡ per square foot or $12,866.00 which added to the above stated value of the improvements reached the total sum due for the taking of $111,470.00. Mr. Deano estimated that part of the Crow remainder lying south of the new road enhanced in value to $1.75 per square foot and the north remainder on new U.S. 190 enhanced in value to 80‡ per square foot after the taking. He considered the two remainders separated by the taking, the larger piece, lying south of U.S. 190, and the smaller .553 acre tract, lying north thereof, were more valuable than they were previous to the taking. He reasoned that there were no severance damages to the two remainders.
Mr. Breeding stated that tract from which Parcel 1-4 was taken originally had dimensions of 150 feet front on U.S. 11 to a depth of 603 feet, containing approximately 90,750 square feet. He eliminated the swimming pool site apparently as not being a part of or contributory to the main tract. He did consider, however, the swimming pool as an improvement in arriving at his values. He attributed a value of 58^ per square foot to this entire tract of land before the taking of $52,500.00. The appraiser states that this square foot value transposes into a value of $350.00 per front foot in view of the excessive depth of the subject tract. He estimated the depreciated cost of the buildings and improvements, including the motel units, to be $107,500.00. This entire tract, with the buildings and improvements before the taking was estimated by Mr. Breeding to be worth $160,000. This appraiser valued the 21,443 square feet taken from this tract at the stated"58}i per square foot or a total of $12,437.00. The total taking of land and improvements from this southerly tract amounted to $119,937.00. His comparable sales which appear to be representative of the subject property, both before and after the taking, give every indication of supporting this appraiser’s estimates of the values of the properties taken, and his opinion that the remainders experienced no severance damage as a result of the taking.
We believe that the landowner appraisers, in arriving at what this court considers inflated appraisal figures, have strayed from the preferred methods of establishing value of lands and improvements as envisioned by the jurisprudence in the failure to use the market data approach, and the cost approach for determining the value of buildings and improvements. While these appraisers contended that these preferred methods are not pertinent and applicable to the facts of this case, we are unable to discern from the record any exceptions which justify a departure from the rules setting forth the prime procedures for evaluating land and improvements. The adoption of the income approach in establishing value may be material in certain cases, but where there have been sales of comparable property, and improvements can be evaluated accurately by cost of reproduction new less depreciation, valuations arrived at by capitalization of rental value should be disregarded. See State, Through the Dept. of Highways v. Lewis, 142 So.2d 652 (La.App. 1st Cir. 1962).
*730 We are unaware of any law or jurisprudence which prevents an expert appraiser from testifying about the value of buildings and improvements, when such testimony is partially based on cost estimates prepared by other persons, such as building contractors or engineers, even though such latter experts may not be present in court. A considerable portion of an expert’s opinion is based often upon his investigations, which necessarily imports at least a modicum of hearsay evidence in reaching an opinion. However, here no damage can be claimed by the defendants on this account, since, in the first place, the defendants did not object to the introduction of this testimony on the ground of hearsay. As a matter of fact the estimate on the cost of reproducing the motel new, prepared by Mr. A. D. Smith, who had died previously to the trial, was offered by Mr. Crow’s counsel, and entered the record by proffer.
Before the trial counsel for all parties litigant stipulated and agreed that the value of Parcel 1-2 was $5,374.00, and the value of Parcel 2-9 was the sum of $4,380.00 or the total amount of $9,754.00, which amounts were over the above the sums deposited by the state for these two tracts.
In view of our conclusions there is no necessity of determining the correctness of the trial court’s judgment in depicting the total amount which is in dispute.
The trial judge was entirely within his discretion in setting the witness fees at $1500.00 for each of the landowner appraisers for these appraisal preparations, which he found to be most reasonable in view of the copious work done. We find no error in his fixing the expert witness fees at $150.00 per day in light of the extremely long days spent in court. The record reflects that these fees were set by the court, and not by the witnesses and counsel.
For the foregoing reasons the trial court judgment is amended by disallowing that part of the judgment which is m excess of $135,425.00, and the judgment will be further amended by adding thereto the sum of $9,754.00, which is the composite amount stipulated and agreed to be due for Parcels 1-2 and 7-9 over and above the sum deposited by the state; accordingly, there will be judgment in favor of the defendants-ap-pellees and against the plaintiff-appellant in the full sum and amount of ONE HUNDRED FORTY-FIVE THOUSAND, ONE HUNDRED SEVENTY-NINE AND NO/100 ($145,179.00) DOLLARS, subject to a credit in the sum of $135,425.-00, with interest at the rate of 5% per an-num from judicial demand until paid on the sum of $9,754.00. In all other respects the judgment of the trial court is affirmed.
Defendants-appellees are cast with the cost of this appeal.
Judgment affirmed, as amended, and recast.